**Dr. Stanley HELLER, Plaintiff-Appellee and Cross-Appellant,**

v.

**The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, Defendant-Appellant and Cross-Appellee.**

Nos. 86–1482, 86–1518.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1987.

Decided Nov. 10, 1987.

John D. Lien, Richard L. Cram, Chicago, Ill., for Equitable Life Assur. Soc. of U.S.

Harvey Sussman, Sussman & Hertzberg, Ltd., Chicago, Ill., for plaintiff-appellee and cross-appellant.

Before WOOD, COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

The Equitable Life Assurance Society, defendant-appellant, appeals from the order of the district court entering a declaratory judgment in favor of Dr. Stanley Heller, plaintiff-appellee, for the defendant's alleged breach of a disability income insurance contract. The district court found that Dr. Heller was entitled to receive $5,880 per month from Equitable on the insurance contract from March 21, 1984, through February 5, 1986, and thereafter for the time period Dr. Heller was totally disabled. Dr. Heller cross-appeals from the district court's order reducing the total amount of disability benefits payable from Equitable, as well as from the district court's refusal to award taxable costs, including attorneys' fees, under Illinois law. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I

Dr. Stanley Heller, a physician, is licensed to practice medicine in the state of Illinois.[1] Dr. Heller is a board-certified physician in the field of Cardiovascular Diseases and specializes in invasive cardiology. He was also the Director of the Cardiovascular Catheterization Laboratory[2] at St. Joseph's Hospital, Chicago.

In early 1983 Dr. Heller met with Paul Berlin, an agent for The Equitable Life Assurance Society (Equitable) to discuss simplifying his existing professional disability insurance coverage, for at the time he was insured under six or seven different policies issued by at least two different companies. After evaluating Dr. Heller's existing policies, Mr. Berlin informed Dr. Heller that if he decided to purchase the Equitable disability income policy as offered ($7,000 monthly), he would be required to cancel his other disability policies.[3] At the time Dr. Heller applied for disability coverage in March of 1983, he represented on the application that he had no other disability coverage as he intended to cancel his other disability policy at the time Equitable's coverage took effect. Equitable's policy, issued the following month in April of 1983, provided that Dr. Heller

1. The jurisdiction of the district court was based upon diverse citizenship between Stanley Heller, citizen of Illinois, and The Equitable Life Assurance Society of the United States, a New York Corporation. 28 U.S.C. § 1332.

2. Dr. Heller's practice, for the most part, consisted of performing invasive catheterization procedures:

"Catheterization of the right and left sides of the heart and selective injection of contrast media into the coronary arteries and cardiac chambers during exposure of high-speed x-ray motion pictures (cineangiography) remain the most reliable methods for defining the dynamic physiology and anatomy of the heart in the normal state and a variety of cardiac disorders. When performed after the application of noninvasive or atraumatic techniques of cardiac diagnosis, the great majority of disorders of the heart can be accurately and fully defined and a rational decision made for medical or surgical therapy. In addition, in the past half-decade, cardiac catheterization techniques have been developed which provide therapeutic benefit and are now being applied on a broad scale."
*Harrison's Principles of Internal Medicine* 888 (11th ed. 1987).

3. Equitable sets the amount of disability coverage available to an insured after considering, *inter alia*, the insured's income and the existence of other disability insurance. In order to prevent over-insuring, insurance companies demand that the applicant disclose all other coverage. Dr. Heller's income was $200,000 per year, and in the absence of other disability insurance he would have been eligible for a monthly disability payment of $8,400 to $8,700 on the basic policy. Dr. Heller made application for only $7,000-per-month coverage on the basic policy, representing on the application that he carried no other disability insurance. In addition to the basic $7,000-per-month payment, he also carried an excess coverage as referred to above.

would be paid the sum of $7,000 per month, after a 90–day elimination period, if and when he became totally disabled as defined in the policy. Dr. Heller, with the payment of an added premium, contracted for additional $1,200–per-month coverage while totally disabled under the policy for a period limited to one year with the same 90–day elimination period incorporated therein. Dr. Heller testified that he directed his office manager to cancel all his other disability policies when the Equitable policy became effective, and "to the best of [his] knowledge," she cancelled the policies. He further testified that it was not until November of 1984, some eight months after his withdrawal from practice, that he was informed by an office employee that he still had an American Motorist Insurance Co. (American Motorists) disability policy in full force and effect.[4]

During the latter quarter of 1983 Dr. Heller developed a painful and crippling condition in his left wrist and hand diagnosed as carpal tunnel syndrome.[5] Dr. Heller testified that as he experienced the debilitating symptoms of the condition in his left wrist and into his hand, he was prevented from practicing in his specialty as an invasive cardiologist after March 20, 1984. Dr. Heller applied for benefit payments on his Equitable disability income policy in late March 1984. The policy issued to Dr. Heller defined "total disability" as follows:

"Total disability means the complete inability of the Insured, because of injury or sickness, to engage in the Insured's regular occupation, ... provided, however, the total disability will not be considered to exist for any period during which the Insured is not under the regular care and attendance of a physician,...."

Dr. Heller claimed that because he was unable to engage in his profession as an invasive cardiologist as a result of the carpal tunnel syndrome condition, and because he was under the regular care of a physician and had made timely premium payments, he was entitled to disability benefits under the policy. Initially, Equitable made payments pursuant to the disability income provisions [6], but terminated these payments after May 5, 1985, because he (Dr. Heller) refused to undergo carpal tunnel surgery upon Equitable's insistence. As a result of Equitable's refusal to continue payments under the contract, Dr. Heller initiated the present action.

Following a trial to the court, the trial judge found that if Dr. Heller were to undergo surgery to decompress the median nerve in his left wrist, he might very well be relieved of the carpal tunnel syndrome condition, thus allowing him to return to his practice. After reviewing Equitable's disability policy, the trial judge determined that Dr. Heller was not required to submit to elective surgery because Equitable failed to include the surgery requirement in its professional disability contract. The trial court ordered Equitable to reinstate disability payments, but because evidence disclosed that Dr. Heller continued to be insured under an American Motorists policy, the trial court reformed the contract concluding that Equitable would have reduced disability payments to $5,880 per month if Equitable had knowledge of the existence of the other insurance at the time of the issuance of the policy in question.

---

4. The office manager, after being directed by Dr. Heller to cancel the American Motorists policy, negligently failed to do so.

5. "Carpal tunnel syndrome ... results from compression of the median nerve and the volar aspect of the wrist between the longitudinal tendons of forearm muscles that flex the hand and the transverse superficial carpal ligament. This compression produces parasthesias in the radial-palmar aspect of the hand plus pain in the wrist, and the palm, or sometimes proximal to the compression site of the forearm. Sensory deficit in the palmar

aspect of the first three digits and/or weakness of the thumb opposition may follow." *The Merck Manual* § 11, at 1384 (14th ed. 1982).

6. Equitable made the following payments to Dr. Heller:

12/05/83 – 03/04/84   $0.00 90-day elimination period
03/05/84 – 12/04/84   $8,200 × 9 = $73,800 ($7,000 + $1,200 supplemental provision = $8,200)
12/05/84 – 05/04/85   $7,000 × 5 = $35,000

On appeal Equitable argues that because Dr. Heller refused to submit to surgery to relieve the debilitating and limiting effects of his carpal tunnel syndrome condition, the trial court erred in finding Dr. Heller to be totally disabled under the terms of the policy. Equitable also asserts that because Dr. Heller misrepresented the nonexistence of the American Motorists disability policy on its application form, the insurance contract should have been rescinded under Illinois law [7] rather than reformed. Thus, because Dr. Heller (1) misrepresented the nonexistence of other insurance; and (2) refused to undergo carpal tunnel surgery, Equitable claims that Dr. Heller is not entitled to disability income payments. Dr. Heller cross-appeals, asserting (1) that he is entitled to the full $7,000 per month Equitable disability payments after the expiration of the five-year American Motorists disability policy; (2) that the trial court failed to award him the $1,200 per month supplemental income as required by the terms of the Equitable policy; and (3) that he is entitled to taxable costs, including attorneys' fees, as a result of Equitable's unreasonable and vexatious conduct terminating his disability income payments.

## II

Illinois law controls this case as Equitable issued the policy to Dr. Heller in Illinois, the state where Dr. Heller resided and practiced medicine. Our research reveals, and both parties agree, that the Illinois courts have not directly addressed the question of whether a disability income policy providing that the claimant must be "under the regular care and attendance of a physician" requires an insured to submit to surgical treatment for the condition causing the total disability in order to receive benefits. Thus, we rely on the tradi-

tional principles of insurance and contract law, long recognized by the Illinois courts as an appropriate basis for resolving whether the clause conditions coverage on the insured's undergoing surgery. Initially, Illinois courts apply the rule that any ambiguities in the provisions of an insurance policy will be construed against the drafter of the instrument, the insurer, and in favor of the insured, *see, e.g., Burton v. Government Employees' Insurance Company*, 135 Ill.App.3d 723, 90 Ill.Dec. 526, 482 N.E.2d 233 (1985); *Dora Twp. v. Indiana Insurance Company*, 78 Ill.2d 376, 36 Ill.Dec. 341, 400 N.E.2d 921 (1980); however, "where ... there is no ambiguity, [the courts] will not ignore the *very plain language of the policy.*" *Rock Island Bank v. Time Ins. Co.*, 57 Ill.App.3d 220, 14 Ill.Dec. 719, 720, 372 N.E.2d 998, 999 (1978) (emphasis added). Secondly, insurance policy "[e]xceptions to liability must be expressed in unequivocal language so that it is reasonable to assume the insured understood and accepted these limitations." *Garman v. New York Life Insurance Company*, 501 F.Supp. 51, 52 (N.D.Ill.1980) (citing *Michigan Mutual Liability Company v. Hoover Brothers Inc.*, 96 Ill.App.2d 238, 237 N.E.2d 754 (1968)).

A reading of the Equitable disability policy discloses that it fails to set forth any requirement or limitation of coverage requiring an insured to submit to surgery for treatment of the condition causing the total disability. The policy provides coverage where (1) the insured is prevented from engaging in his or her regular occupation because of sickness or injury and is totally disabled; and (2) that the insured be under "the regular care and attendance of a physician." [8] Equitable does not dispute that Dr. Heller is presently unable to practice as

---

**7.** "No misrepresentation or false warranty made by the insured ... in the negotiation for a policy of insurance, ... shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy ..., or in the written application therefor, of which a copy is attached to or indorsed on the policy, and made a part thereof. No such misrepresentation or false warranty shall de-

feat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company...."
Ill.Rev.Stat. ch. 73 ¶ 766 (1983).

**8.** Physician is defined in the policy: "Physician means a legally qualified physician other than the Insured."

an invasive cardiologist but argues that his failure to submit to surgery for his disabling condition as recommended[9] requires a finding by the Court that he is no longer "under the regular care and attendance of a physician." Therefore, Equitable asserts that Dr. Heller is no longer entitled to disability income benefits.

We reject Equitable's arguments because the language in the policy stating that the claimant must be "under the regular care and attendance of a physician" clearly does not include surgical procedures. Although the policy does not define the parameters of the clause "under the regular care and attendance of a physician," we refuse to add to and construe the policy beyond its clear and obvious language, to require the insured to submit to surgery, if and when surgery is recommended by the physician "rendering regular care and [in] attendance." The language is clear on its face to the average citizen and even more so to a member of the medical profession. We are convinced that under Illinois law the clause "under the regular care and attendance" means just what it says, namely, that the insured is obligated to periodically consult and be examined by his or her treating physician at intervals to be determined by the physician. Clearly the language does not condition disability payments on the insured's undergoing surgery if recommended by the physician rendering "regular care and [in] attendance." We refuse to indulge in judicial activism and condition coverage under the contract on the insured's undergoing surgery, when the insurer failed to provide such a conditional clause in the policy.

The clause, "under the regular care and attendance of a physician," was not intended to allow the insurer to scrutinize, determine, and direct the method of treatment the claimant receives. We are convinced that the purpose of the clause requiring the insured to be "under the regular care and attendance of a physician" is to determine that the claimant is actually disabled, *see, e.g., Russell v. Prudential Insurance Company of America,* 437 F.2d 602, 607 (5th Cir.1971), is not malingering, and to prevent fraudulent claims.

The insurance industry by its very nature offers insurance coverage on a non-negotiable basis, and consumers are unable to participate in the drafting of the language or the terms of the policy. Case law and fairness require that ambiguities in insurance policies be construed against the drafter of the policy, the insurance company.

In the absence of a clear, unequivocal and specific contractual requirement that the insured is obligated to undergo surgery to attempt to minimize his disability, we refuse to order the same. To hold otherwise and to impose such a requirement would, in effect, enlarge the terms of the policy beyond those clearly defined in the policy agreed to by the parties. *See, e.g., John Hancock Mutual Life Insurance Company v. Spurgeon,* 175 Tenn. 319, 134 S.W.2d 155 (1939).[10] Thus, under the terms

---

**9.** Dr. Heller was examined by and consulted with a number of doctors, and at least two recommended surgery.

**10.** Equitable asserts that carpal tunnel surgery is "common and of a minor, low-risk variety," and urges this court to apply the reasoning in *Casson v. Nationwide Insurance Co.,* 455 A.2d 361 (Del.Supp.1982), to Dr. Heller's situation. In *Casson,* the court held that the insured must submit to reasonable *medical treatment* if the disability is correctable; thus Equitable asserts that Dr. Heller should be required to undergo minor surgery that, as the district court found, might relieve the disability. But the district court made no finding as to whether the carpal tunnel surgery was "major or minor" and rejected Equitable's argument because the policy did not include an express condition requiring the insured to submit to surgery and noting that surgery is not equivalent to medical treatment, and vice versa. We agree with the district court and direct Equitable's attention to Appleman, Insurance Law and Practice § 656, noting:

"A slightly different situation is presented where the insurer requests the insured to undergo an operation to clear up the difficulty. The better rule is to the effect that the insured, in the absence of a specific policy provision so declaring, is under no obligation whatsoever to the insurer to help it rid itself of its obligations, particularly where an operation is demanded. Accordingly, the insured may refuse to undergo an operation and the insurer must continue to make disability payments to him."

Further, *Casson,* on which Equitable relies, notes that the majority view does not even re-

of this disability policy, Dr. Heller is not required to undergo surgery for treatment of his carpal tunnel syndrome condition before he receives disability income payments.

In a feeble attempt for support Equitable reaches out and tries to rely on the Illinois worker's compensation statute for support. The applicable statute, they point out, provides:

"If any employee ... shall refuse to submit to such medical, surgical, or hospital treatment as is reasonably essential to promote his recovery, the commission may, in its discretion, reduce or suspend the compensation of any such injured employee."

Ill.Rev.Stat. ch. 48 ¶ 138.19(d) (1985). Equitable, without citing any Illinois authority, requests that we interpret the policy clause "under the regular care and attendance of a physician" to require an insured to submit to surgery and thus incorporate Illinois worker's compensation theories regarding an employee's duty to undergo

surgery into this private insurance contract. Equitable simply concludes that "there is no reason to believe Illinois Courts would refuse to imply submission to medical treatment [which in this case is surgery] as part of the requirement to be under the 'care and attendance of a physician.'" App.Br. at 18. We do not agree with Equitable's speculative assertion because the disability policy, unlike the worker's compensation statute, failed to even imply, much less require, that the insured submit to a surgical procedure. We remind Equitable that the policy is not the product of a state-enacted worker's compensation act passed in a legislative arena, the basic purpose of which is to provide prompt relief to injured employees. Rather, Dr. Heller entered into a mutually binding private insurance contract for professional disability insurance with Equitable and obligated himself to pay a substantial bi-annual premium. In the absence of an express provision obligating the insured to undergo surgery, we refuse to place such a requirement upon the insured.[11]

quire the insured to minimize his disability with *medical treatment* absent a specific contractual requirement, much less require an insured to submit to surgery.

11. We will not now consider what might be reasonably essential to promote an insured's recovery where, as here, the insurer fails to include any provision requiring an insured to submit to surgery. But we note that Illinois law "recognizes that consideration must be given to 'divergent personalities, beliefs and fears' in gauging the reasonableness of a claimant's refusal to submit to surgery." *Allied Chemical Corp. v. Industrial Commission of Ill.,* 140 Ill. App.3d 73, 94 Ill.Dec. 604, 607, 488 N.E.2d 603, 606 (1986) (citing *Rockford Clutch v. Industrial Com.,* 34 Ill.2d 240, 215 N.E.2d 209 (1966). In the case at bar, Dr. Perlik, a neurologist at Michael Reese Hospital and the plaintiff's principal treating physician testified as to the possible adverse side effects of the surgery in question as follows:

"Among the complications are as follows: *Number one,* you can cut the palmer cutaneous nerve ... [and] ... lose sensation on the palm of your hand. *Number two,* ... you can develop a thick hypertrophic scar, because you have to go across the wrist. *Number three,* if your not careful, because there are twenty-nine anatomical [sic] variations of the motor enervation of the median nerve, if a sugeon [sic] is not careful, he can easily cut the motor branch of the median nerve, which goes into the thumb, ... *[N]umber [four],* and

the most common complication associated with carpal tunnel, is incomplete release; and, therefore, people who have gone through surgery and have woken up with the same problem they began with; *[N]umber [five],* you can develop infection; *[N]umber [six],* you can develop adhesions on the synovium, ...; *[N]umber [seven],* if you explore the carpal tunnel you can develop, because of the nature of the small area that you are working at, if you feel you need to lysis the nerve, you can develop bleeding within the carpal tunnel. If that occurs then you end up right back with the same problem you began with, because that is a median entrapment more distal in the hand. And another uncommon complication is a syndrome known as 'sympathetical reflex distrophy', which is also known as 'causalia', which is a poorly understood but well-known disorder of the nerve, the muscle, the bone and the blood vessel of the hands, which is characterized by a cold, blue, husky hand, with detractable, persisting pain, that comes about with just the slightest degree of movement; the mechanism for that is very unclear, nevertheless, it is a described complication of that surgery."

Under these circumstances, even if the Equitable policy contained an express term requiring the insured to undergo "reasonably essential" surgery, we seriously doubt that Dr. Heller's refusal to undergo surgery would be unreasonable. This is especially the case because the

Lastly, Equitable argues that the "principle of fairness and good faith, a policy of motivating persons to correct rather than accept physical disabilities," necessitates that an insured suffering from causes that disabled him, avail himself of all reasonable means and remedies to relieve his disability, including surgery. Once again, we reject Equitable's argument. The record clearly establishes that Dr. Heller acted in good faith. Initially, Dr. Heller properly reported his disability to Equitable and consulted with and remained under the regular care of his physician as required under the policy. Further, at Equitable's request, Dr. Heller acquiesced to an examination performed by two specialists selected by Equitable, one a hand surgeon and the other a neurologist, at the Mayo Clinic in Rochester, Minnesota. Additionally, there is nothing in the record to establish that Dr. Heller failed to provide Equitable with any and/or all supplemental information required. The record further demonstrates that after Dr. Heller's condition was diagnosed and before he filed a claim for disability payments, Dr. Heller was forced to reduce his case load beginning in December 1983 to March 1984, and thereafter was forced to withdraw from practice.[12] The trial court found that Dr. Heller fulfilled his obligations under the policy; we agree and hold that Dr. Heller did all that was required of him under the terms of the Equitable disability policy.

However, Equitable insists that the insured, as a party to an insurance contract, has a good faith "duty to cure his disability if he can do so without reasonable risk and pain to himself." [13] Equitable ignores the fact that many insureds like the plaintiff-appellee, choose not to undergo surgery because of the accompanying risks of infection, transfusion (hepatitis), bleeding, motor enervation of the median nerve, adhesions, scar tissue, possible anesthetic shock, trauma, anxiety, and even reoccurrence of the carpal tunnel syndrome condition. We are convinced that under Illinois law an insured is not required to undergo these risks in the absence of a specific contractual requirement. Furthermore, it seems very evident that because of these risks and other risks in the majority of surgical procedures, courts have wisely adopted the doctrine of informed consent.

Although we might not choose to follow the same course of conduct and path of reasoning as Dr. Heller,[14] there is no moral, much less legal obligation or compelling reason, to second guess an insured's, and in this case Dr. Heller's, decision to forgo surgery. The insurance company seeking to condition coverage on its insureds' acquiescence to undergo surgery to minimize the

carpal tunnel syndrome condition can and does frequently reoccur even after the patient undergoes surgery.

**12.** It is significant to point out that Dr. Heller received treatment for his carpal tunnel syndrome condition. Dr. Loughran, an orthopedic surgeon at St. Joseph Hospital, injected a steroid into Dr. Heller's wrist, attempting to minimize the disability and allow him to return to practice.

**13.** Equitable asserts that:
"[t]he person, such as Dr. Heller, who 'clings' to his disability must constantly guard against becoming better. He must always choose the cringing, somewhat masochistic method of dealing with the disability. These are not characteristics the law should encourage and reward."
App.Br. at 20. "Masochistic" can be defined as "a tendency to take pleasure in physical or mental suffering inflicted on one by oneself." *Webster's Third New International Dictionary* (1981).

The record is barren of evidence that even indicates, much less establishes, that Dr. Heller's method of dealing with his disability was "masochistic," thus Equitable's assertion is necessarily inapt. Furthermore, Equitable never made this outrageous argument to the trial court. We point out that there is a substantial difference between (1) a self-inflicted injury, and (2) a disability not caused by the individual, but who simply refuses to endure the risk, trouble, expense and often trying experiences incident to medical treatment. In the case of a self-inflicted disability, the act itself is contrary to public policy, regardless of the existence of insurance. As we pointed out, Dr. Heller's course of conduct did not exhibit any trace of bad faith, much less indicate the injury was self-inflicted. We caution counsel that in the future it should refrain from inferring such ridiculous and malicious allegations of this nature without one scintilla of support.

**14.** We note that Dr. Heller has apparently abandoned his profession as a surgeon to pursue a new career in law.

extent of their disabilities, as well as the financial loss to the insurer, need only incorporate a specific requirement[15] to that effect in the policy, and we would not hesitate to enforce the same. On the other hand, insurers who fail to include this express surgical contractual requirement, and who refuse to cover an insured after entering into a binding and enforceable agreement after accepting substantial premiums, in circumstances such as those before us, cause problems not only for the insured, but for the insurance industry as well. Insurance companies, members of a service industry, must recognize that, like their insureds, they have corresponding duties and obligations under the policy and must conduct themselves accordingly instead of attempting to rely on the courts to correct their own deficiencies in underwriting and/or careless policy drafting.

### III

The district court found that at the time Dr. Heller applied to Equitable for the professional disability income policy, he negligently, but not willfully, represented that he did not have other disability income coverage in force. As it turned out, Dr. Heller was still insured by a Group Disability Policy issued by American Motorists Insurance Co. during the period of disability. Under this policy American Motorists was obligated to pay Dr. Heller benefits of $600 per week for five years, so long as Dr. Heller was totally disabled from practicing as an invasive cardiologist. Dr. Heller applied for benefits under the American Motorists policy and will receive $600 per week until the expiration of the policy.

In its amended answer to the plaintiff's amended complaint, in the amendment to its counterclaim, and in its trial brief, Equitable asserted that Dr. Heller's "misrepresentation to Equitable on his application as to the existence of disability coverage" justified rescission or, in the alternative, reformation of the disability policy under Illinois law. However, the record reveals that during the trial, Equitable neither presented evidence nor argued to the court for rescission; rather, Equitable presented evidence only to support its theory of reformation and requested reformation exclusively as the remedy for Dr. Heller's misrepresentation. In his opening statement Attorney John D. Lien, counsel for Equitable, responded to the court as follows:

"[MR. LIEN] ... We will further show, your Honor, that at the time Dr. Heller applied for this policy, he was asked whether or not he had in force or intended to keep in force existing disability income policies. Equitable's underwriters were unaware that Dr. Heller had and subsequently kept in force a policy with one of the Kemper Group of policies, that will pay Dr. Heller $600 a week. After Dr. Heller became disabled he applied for and received benefits under that policy. *Had Equitable known of that policy, they would have issued insurance, but not for $7,000 a month, for a lesser amount.* And will [sic] have one of Equitable's underwriters who will testify as to exactly how that would affect it—the issuance.

THE COURT: What's your position on the circumstances which created whatever obligation Dr. Heller had to tell you about that; what is it, a questionnaire, and interview?

MR. LIEN: It was a questionnaire and an interview with an agent, your Honor. There is disputed testimony as to what was said. I believe Dr. Heller will say that he revealed the policy, it was merely an accident that one of them remained in effect, that he did not intend to mislead anyone, the agent knew of the existence of the policies and it so happened that

---

**15.** For example, an insurance company might include a provision in the policy for submitting claims involving refusals to undergo surgical and medical procedures to a panel of experts. Each party could choose a board-certified specialist in the relevant area of medical expertise required to sit on the panel, and the third panelist, also independent and board-certified, could be chosen by the Dean of a recognized medical school in the area. The specialists would be empanelled to determine the extent and the treatment of the disability and decide whether the insured should submit to surgery. The panel's decision would then be binding on the parties if so written into the contract with specificity.

the premium was accidently paid, at a later time in 1983. I don't think I misrepresent their side of that—of that story. What Equitable will ask for, your Honor, is a declaratory judgment that: Unless Dr. Heller submits to this remedial surgery, he should not be considered totally disabled within the meaning of the policy, which requires him to be under the care and attendance of a physician. We will ask for a money judgment for the three months of benefits that were paid him, due to what we allege was a miscalculation of the elimination period. *We will further ask that the Court, if it finds in Dr. Heller's favor, that Equitable be held responsible only for the lower amout [sic] of insurance that would have been written."*

(Emphasis added). We note that Mr. Lien failed to even mention rescission in his opening statement and in fact implicitly requested reformation of the contract, as he said: "We will further ask that the Court, if it finds in Dr. Heller's favor, that Equitable be held responsible only for the lower amout [sic] of insurance that would have been written." Additionally, during the trial, Mr. Pisani, Equitable's expert, and Mr. Berlin, the Equitable insurance agent, both testified, consistent with defense counsel's theory of the case that Equitable would have insured Dr. Heller even if it had knowledge that he was also insured by the other policy, but for less than the $7,000 per month disability benefit. Mr. Pisani further testified that given Dr. Heller's income and the existence of the American Motorists coverage, Equitable would have provided Dr. Heller only with coverage of $5,880 per month. In closing argument Mr. Lien clearly repeated his earlier request for reformation, stating:

"We would suggest and *request* that even if your Honor finds in Dr. Heller's favor ... that you would reduce the benefits payable to the amount of $5,880 per month."

(Emphasis added). At the conclusion of the trial, and it should come as no surprise to Equitable, the district court reformed the contract, finding that if Equitable had known that Dr. Heller was insured under the American Motorists policy at the time it considered and accepted the plaintiff's application, Equitable would have issued Dr. Heller a disability income policy with a maximum benefit of $5,880 per month instead of the $7,000 per month actually provided by the policy. Equitable asserts that the court erred because it reformed, rather than rescinded the policy.

Although Equitable initially raised rescission in its pleadings and trial brief as an alternative remedy for Dr. Heller's misrepresentation of the nonexistence of other insurance, we refuse to reach the merits of this argument because Equitable failed to either produce evidence in support thereof, much less argue for rescission during the trial, and in effect Equitable abandoned its alleged theory of rescission as a remedy for Dr. Heller's misrepresentation.[16] On numerous occasions we have held that "if a party fails to press an argument before the district court, he waives the right to present that argument on appeal." *Ohio Casualty Ins. Co. v. Bazzi Construction Co., Inc.,* 815 F.2d 1146, 1149 (7th Cir. 1987); *see, e.g., National Fidelity Life Insurance Co. v. Karaganis,* 811 F.2d 357, 360 (7th Cir.1987); *Lazzara v. Howard A. Esser, Inc.,* 802 F.2d 260, 268 (7th Cir. 1986); *Erff v. Markhon Industries, Inc.,* 781 F.2d 613, 618–19 (7th Cir.1986). " 'In our view, a trial judge may properly depend upon counsel to apprise him of the issues for decision. He is not obligated to conduct a search for other issues which may lurk in the pleadings.' " *Libertyville Datsun Sales v. Nissan Motor Corp.,* 776 F.2d 735, 737 (7th Cir.1985) (quoting *Desert Place, Inc. v. Salisbury,* 401 F.2d 320, 324 (7th Cir.1968)).

In this case the trial judge did more than just depend upon counsel for Equitable to

---

**16.** After scrutinizing the record, we observe that Equitable failed to formerly object on the record to the Findings of Fact and Conclusions of Law submitted by the parties (after a cooperative effort) to the trial court. By failing to object to the submitted Findings of Fact and Conclusions of Law, specifically including that reformation was the appropriate remedy in this case, Equitable effectively abandoned its defense of rescission.

"apprise him of the issues for decision," *Id.;* the trial judge went so far as to actually grant Equitable's request at trial for reformation in the event the court found in favor of the plaintiff with respect to whether he was required to undergo surgery. Because Equitable abandoned rescission as a remedy for Dr. Heller's misrepresentation before the district court, it is precluded from raising the issue on appeal. As we have made clear, "[i]t is axiomatic that arguments not raised below are waived on appeal." *Keene Corp. v. International Fidelity Ins. Co.*, 736 F.2d 388 (7th Cir. 1984).

## IV

■ The district court, after finding that Dr. Heller was not required to undergo surgery under the terms of the Equitable insurance policy, found that:

"Equitable is entitled to a credit or offset from Dr. Heller to the extent Equitable made greater payments than $5,880.00 a month calculated from March 21, 1984. [The Equitable policy] should be reformed to reduce the monthly benefits to $5,880.00."

On his cross-appeal Dr. Heller initially asserts that after the benefits for the American Motorists policy are exhausted, he should again be entitled to receive the full monthly benefits of $7,000 under the Equitable policy since he paid premiums for coverage of $7,000 per month and not for the $5,880 per month payment. If we assume, *arguendo*, that Equitable knew of the American Motorist policy it would have provided Dr. Heller with only $5,880.00 per month, under these circumstances, Dr. Heller might not have been entitled to coverage of $7,000 per month at any time. However, after reviewing the record, we failed to discover any testimony that would establish this fact, and thus we find it necessary to remand this matter to the trial court for factual findings on this issue. We also note that although we do not reject Dr. Heller's argument, we point out that if Equitable retained premiums based on coverage of $7,000 per month, Dr. Heller is at least entitled to a refund of any premium

overcharge. Our review of the record reveals that the district court, in its Findings of Fact and Conclusions of Law, and in its Order, failed to consider whether Dr. Heller was entitled to a premium refund or the full $7,000 payment upon termination of the other insurance. Thus, we set aside the Order of the district court and remand the case for factual findings and a determination of whether Dr. Heller is entitled to $7,000 per month upon termination of the American Motorist payments or whether, in the opinion of the trial court, Dr. Heller is entitled to a premium refund or other applicable equitable relief.

■ Secondly, Dr. Heller claims that he is entitled to the full $1,200 per month disability income payment provided pursuant to the supplemental income provision for which he paid an additional premium. The provision states:

"This provision is included as part of this policy in consideration of the payment of the additional premiums therefor stated on page three and is subject to all the provisions of this policy.

If Monthly Income becomes payable under this policy because of total disability of the Insured, the Equitable will also pay the amount of Supplemental Income shown on page three for each month (one-thirtieth of the Supplemental Income for each day of any period less than a full month) Monthly Income is payable during the first twelve months of a continuous period of total disability. In no event will Supplemental Income be payable with respect to the elimination period included in such twelve-month period nor will the amount of the Supplemental Income be increased during any one continuous period of total disability by reason of such disability being due to more than one cause."

However, the district court's findings with respect to Equitable's credit or offset award do not refer to the supplemental income payments. We note that these supplemental income payments were made in addition to those payments made for the $7,000 monthly disability coverage. Because the district court failed to make spe-

cific findings with respect to Dr. Heller's entitlement to payments on his supplemental income coverage, we also remand this issue.

■ Lastly, we do not agree with Dr. Heller's assertion that the district court abused its discretion when it denied his claim for taxable costs, including attorney's fees, under Illinois law. The Illinois Insurance Code provides that if an insurer vexatiously or unreasonably delays in settling a claim, the court may allow as taxable costs attorney's fees plus an amount not to exceed 25% of the amount the insured is entitled to recover, five thousand dollars ($5,000) or the excess of the amount the insurer offered in settlement of the claim. Ill.Rev.Stat. ch. 73 ¶ 767 (1983). Initially, Equitable fulfilled its obligation under the contract making monthly disability payments to Dr. Heller but subsequently terminated the payments when it determined that Dr. Heller was required to submit to surgical procedure under the terms of the policy for the carpal tunnel condition. Although we hold that Equitable's argument with respect to requiring an insured to undergo surgery under this policy is without merit, we do not believe that this particular theory of Equitable's defense was so unbelievable as to reach the level of being classified as vexatious or unreasonable. Therefore, we agree with the district court in holding that Dr. Heller was not entitled to recover on his claim for taxable costs, including attorney's fees.[17]

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings consistent with this opinion.

---

**17.** Dr. Heller is not entitled to punitive damages in light of our holding and reasoning in this opinion.