**Syed F. RAHMAN, M.D., Plaintiff,**

v.

**PAUL REVERE LIFE INSURANCE CO., INC., Defendant.**

No. 87 C 0533.

United States District Court, N.D. Illinois, E.D.

April 20, 1988.

Robert Orman, Kappil & Orman, Chicago, Ill., for plaintiff.

Michael J. Smith, Timothy K. Travers, Tenney & Bentley, Chicago, Ill., for defendant.

MEMORANDUM OPINION
AND ORDER

ASPEN, District Judge:

Plaintiff Syed F. Rahman, M.D. ("Dr. Rahman") brought this declaratory judgment action in state court to enforce the terms of his disability insurance policy.

Defendant Paul Revere Life Insurance Company ("Paul Revere") removed the case to this Court on the basis of diversity. Currently before the Court is Dr. Rahman's motion for summary judgment. For the reasons noted below, we grant that motion.

## I.

Dr. Rahman is an Illinois licensed physician who purchased a disability insurance policy from defendant Paul Revere in March 1984.[1] Prior to the purchase of the policy, Dr. Rahman was a cardiologist at Jackson Park Hospital, specializing in the treatment of already-hospitalized patients who required emergency cardiac care.

An essential aspect of Dr. Rahman's position at this time was to run to the bedside of patients in cardiac distress to administer emergency aid.[2] Dr. Rahman continued his position as an emergency cardiologist until early February 1983 when he was in an automobile accident, in which his leg was injured. His leg was put in a long leg cast, but this was unsuccessful in healing his leg.[3] He was then treated with an electrical stimulator until May of 1984. This, too, was unsuccessful so his doctors decided he needed to have surgery on his leg. After surgery, his leg was put back in a long leg cast for about two to three months. Then, until February of 1985, his leg was immobilized by a short leg cast and other methods of immobilization. For the next year and a

half, he underwent physical therapy. When he was examined at the request of Paul Revere by Dr. Jordan H. Trafimow in June of 1986, Dr. Trafimow concluded that Dr. Rahman still had a loss of motion in his foot and had leg pains which prevented Dr. Rahman from running to his patients if they went into cardiac arrest.

In May 1983, Paul Revere began paying Dr. Rahman disability benefits pursuant to the disability policy. Paul Revere continued to make payments until the end of June 1986. In late July 1986, Dr. Rahman received a letter from Paul Revere which indicated that Paul Revere was terminating Dr. Rahman's disability payments because Paul Revere did not think Dr. Rahman was still disabled pursuant to the terms of his policy. After numerous letters back and forth between the parties, Dr. Rahman filed this suit in state court to enforce the policy.

## II.

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, Rule 56(c) requires the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a show-

---

1. These facts are taken from plaintiff's statement of uncontested facts filed pursuant to Local Rule 12(f). Only those facts that were not properly disputed by Paul Revere are used. Pursuant to Local Rule 12(e), every motion for summary judgment shall include "a statement of the material facts as to which the moving party contends there is no genuine issue...." Pursuant to Local Rule 12(f), a party opposing summary judgment shall serve "a concise 'statement of genuine issues' setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, including with that statement references to the affidavits, parts of the record and other supporting materials relied upon to support such statement." Failure to controvert the material facts set forth in the moving parties' 12(e) statement results in the admission of all such facts.

2. Paul Revere in paragraph one of its response to Dr. Rahman's 12(e) statement disputes Dr.

Rahman's assertion that an essential aspect of his emergency cardiology practice was the ability to run to the bedside of patients in cardiac distress. However, as discussed infra at section II.c., we find its opposition unsupported by evidence.

3. The facts relating to Dr. Rahman's injuries are taken from Dr. Trafimow's report (Defendant's Exhibit E). Although Dr. Rahman challenges his report as hearsay, the Supreme Court has indicated that one *opposing* a motion for summary judgment need not produce evidence in a form that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Therefore, we may consider the report in opposition to this motion for summary judgment, whether or not it may not be admissible into evidence at trial.

ing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A party may not rest upon pleadings to oppose a motion for summary judgment and must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Boruski v. United States*, 803 F.2d 1421, 1429 (7th Cir.1986) ("Reliance on the allegations in the pleadings is not enough.").

Dr. Rahman contends that we should grant his motion for summary judgment because he is disabled and has been since the discontinuation of payments on June 24, 1986, within the meaning of that term as set forth in his policy. The Rider to his policy sets forth the following definition for "Total Disability":

> "Total Disability" means that, as a result of such injury or sickness, the *Insured is unable to perform the duties of his regular occupation;* however, after Monthly Indemnity has been payable hereunder during any continuous period to the Insured's sixty-fifth birthday, then during the remaining, if any, of the period for which Monthly Indemnity is payable, "total disability" shall mean complete inability of the Insured as a result of such injury or sickness to engage in any gainful occupation for which he is reasonably fitted by education, training or experience, giving due consideration to his economic status at the beginning of disability.

(Defendant's Exhibit C at A–10).

The definition of disability in Dr. Rahman's Rider, which both parties agree is the controlling definition for this case, is in contrast to the standard definition of disability in Paul Revere's policy:

> "Total Disability" means that, as a result of such injury or sickness, the Insured is *completely unable to engage in his reg-ular occupation;* however, after Monthly Indemnity has been payable hereunder during any continuous period of disability to the Insured's fifty-fifth birthday or for a period of sixty months, whichever is the longer, then during the remainder, if any, of the period for which Monthly Indemnity is payable, "total disability" shall mean complete inability of the Insured as a result of such injury or sickness to engage in any gainful occupation for which he is reasonably fitted by education, training or experience, giving due consideration to his economic status at the beginning of disability.

(Defendant's Exhibit C, A–6).

Paul Revere raises four issues (although not in this order) in opposition to Dr. Rahman's motion for summary judgment. First, it questions how "occupation" should be defined under the policy. Secondly, it argues that there is a disputed issue of fact as to whether Dr. Rahman has a physical limitation affecting his ability to run to his emergency cardiac patients. Thirdly, it disputes whether an essential aspect of Dr. Rahman's pre-injury practice was to run to his patients. Finally, it argues that Dr. Rahman is not entitled to a lump sum payment of $185,346 because the disability policy insures Dr. Rahman only against injury or sickness resulting in continuous total disability.

a.

▇ For purposes of this motion for summary judgment, both parties agree that under Illinois law the definition of disability in Dr. Rahman's Rider to his insurance policy makes his policy an occupational disability policy which means that the insured must be unable to perform the substantial and material duties of his regular occupation in the usual and customary manner.[4] First we must determine what Dr. Rahman's "regular" occupation was at the time of his injury. Dr. Rahman contends that he was an emergency cardiologist. Paul Revere argues that his regular occupation under the terms of the policy

---

**4.** In this diversity case, the parties assume Illinois law applies. Because there appears to be no other state with any contact to this dispute, we see no reason to contradict the parties' assumption.

was as a cardiologist. Unfortunately, the disability policy does not define "regular occupation."

Under Illinois law, courts apply the rule that any ambiguities in the provisions of an insurance policy will be construed against the drafter of the instrument, the insurer, and in favor of the insured. *See, e.g., Burton v. Government Employees Insurance Company*, 135 Ill.App.3d 723, 90 Ill. Dec. 526, 482 N.E.2d 233 (1985); *Dora Township v. Indiana Insurance Company*, 78 Ill.2d 376, 36 Ill.Dec. 341, 400 N.E.2d 921 (1980). Thus, under Illinois law, we should resolve the ambiguity concerning the definition of "regular" occupation in favor of the insured. In this case, that means we conclude that Dr. Rahman's "regular" occupation was the narrower position of an emergency cardiologist, instead of the broad field of cardiology in general. Also, we note that, despite the availability of testimony from the Director of Emergency Services at Rush–Presbyterian St. Lukes Medical Center, Paul Revere presents no evidence that there is no such thing as a specialist in emergency cardiology. Accordingly, we conclude that the relevant "regular" occupation is the specialty Dr. Rahman engaged in prior to his accident, which is emergency cardiology. Thus, it is irrelevant whether or not Dr. Rahman is able to do the duties of a general cardiologist.

b.

█ Dr. Rahman contends that his inability to run to his emergency cardiology patients prevents him from performing the substantial and material duties of his regular occupation in the usual and customary manner. We conclude that it is undisputed that Dr. Rahman has a physical limitation affecting his ability to run to his emergency cardiac patients. Paul Revere's own affiant, Dr. Jordan H. Trafimow, indicated in his report that he agreed that Dr. Rahman could not run to his emergency patients. (Defendant's Exhibit E at A–14). Paul Revere attempts to dispute this, but we find its attempt inadequate.

In its 12(f) statement, Paul Revere states:

Paul Revere denies that, as a result of certain surgical procedures, Rahman's ability to locomote was restricted. Paul Revere further denies that, after this operation, Rahman was unable to run to those patients requiring emergency cardiac services. Paul Revere also denies that, as a result of the alleged loss of his ability to move rapidly, Rahman has been unable to practice medicine as a cardiologist.

(Am.Resp. at A–2, ¶ 6).

Under the first statement, it is unclear whether this disputes the cause of Dr. Rahman's inability to locomote or whether it disputes the fact that his ability is limited. If the first, it is irrelevant; if the second meaning, we find no support in the record. The only evidence cited by Paul Revere that is relevant on the issue of Dr. Rahman's inability to freely locomote is Dr. Trafimow's report. Dr. Trafimow, however, agreed that Dr. Rahman has a physical limitation. As to the second statement, i.e. that Paul Revere denies that Dr. Rahman was unable to run to his patients, we also find no support in the record. Paul Revere cites eleven exhibits in support. Exhibits D and E are Dr. Trafimow's report which actually agrees that Dr. Rahman cannot run to his emergency cardiac patients. Exhibits F and G are Dr. Paul K. Hanashiro's affidavit and resume. Dr. Hanashiro is the Director of Emergency services at Rush–Presbyterian St. Luke's Medical Center, Chicago, Illinois. Dr. Hanashiro has no personal knowledge of Dr. Rahman, and he therefore cannot testify to Dr. Rahman's ability to run. Exhibit H is the affidavit of Ann Jones, a head nurse at Dr. Rahman's hospital. She does not indicate that Dr. Rahman can run to his patients. Exhibit J contains excerpts from Dr. Rahman's deposition; these excerpts actually support the fact that Dr. Rahman can no longer run to his emergency cardiac patients.

Exhibit L is an affidavit of the Jackson Park Risk Manager, and Exhibit M is a chart she identifies as a listing of Code 99 sheets. Code 99 sheets contain information pertaining to emergency cardiac arrests,

also known as "Code Blues." The chart lists the total number of Code Blues occurring at the hospital between the years 1979 and 1987 and the dates on which Dr. Rahman responded to a Code Blue situation. The chart indicates that Dr. Rahman was present at nine Code Blues in the four and one-half years following his accident. Presumably, this is to demonstrate that Dr. Rahman can still run to respond to Code Blues. Ms. Berwanger, however, indicates that the Code 99 sheets only indicate the names of physician(s) in attendance. She did not state that all physicians in attendance at Code Blues run. Dr. Rahman's deposition, however, seems to indicate that he always ran to Code Blues. Dr. Rahman in his reply, but not by way of an evidentiary submission, states that all of the nine emergencies occurred while he happened to be present on the floor. However, even assuming that in the course of four years Dr. Rahman was able to run to nine patients, this is hardly evidence that he was able to do the "substantial and material functions ... of his regular occupation in the *usual and customary way.*" Merely being able to run in isolated instances is hardly the usual and customary way Dr. Rahman practiced his specialty.[5]

Finally, we note that in opposition to a motion for summary judgment, it is Paul Revere's burden to show there is a genuine issue for trial. A genuine issue for trial only exists when there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party. *Flip Side Productions, Inc. v. Jam Productions,* 843 F.2d 1024, 1032 (7th Cir.1988). The Court is not to weigh the evidence but " '[i]f the evidence is merely colorable, or is not significantly probative,' " summary judgment is appropriately granted. *Id.* at 1032 (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed. 2d 202 (1986)). We do not believe that the lone fact that Dr. Rahman responded to nine Code Blues over a four and one-half

year period could support a jury verdict that Dr. Rahman could run to his patients in the customary and usual way he ran prior to his accident in light of Dr. Trafimow's report and Dr. Rahman's own testimony. Accordingly, we reject Paul Revere's attempt to controvert Dr. Rahman's inability to run to his patients.

c.

Paul Revere states in its 12(f) motion that it "denies that an essential aspect of Dr. Rahman's emergency cardiology practice was the ability to run to the bedside of patients in cardiac distress to administer appropriate emergency cardiac treatment." (Am.Resp. at A–2, ¶ 1). In support of this denial, Paul Revere cites Exhibit F (A–15) and Exhibit M (A–39). We do not find, however, that these exhibits controvert Dr. Rahman's statement. Exhibit F is the affidavit of Dr. Hanashiro. All Dr. Hanashiro states is the following:

> The management of cardiac arrest is only one aspect of cardiologic medicine, and, in my opinion, the ability of a cardiologist to run to emergency cardiac patients is not a substantial and material function, duty, or responsibility of the practice of *medicine in the field of medicine identified as cardiology.*

(Hanashiro Aff. at ¶ 3). Dr. Hanashiro, first, having no personal knowledge of Rahman's practice at the time of injury, would not be competent to controvert Dr. Rahman's statement. Second, his statement does not even address, in general terms, the specific practice of Dr. Rahman's emergency cardiology specialty. Dr. Hanashiro comments only on the practice of cardiology in general. Dr. Rahman does not claim that an essential aspect of cardiology involves running, only that his *emergency cardiology* practice involved running. Additionally, because we have identified Dr. Rahman's "regular" occupation as an emergency cardiologist, evidence as to his ability to act as a general cardiologist is irrelevant.

---

**5.** We also observe that Paul Revere's reference to Dr. Rahman's attendance at Code Blues prior to June 11, 1986, is particularly confusing when it concedes he was totally disabled within the terms of the policy from the accident in February 1983 through June 11, 1986. Thus, the fact Dr. Rahman was present at six Code Blues during a period of admitted disability means that he could be disabled and still able to respond to a limited number of Code Blues.

Exhibit M is a chart which shows the number of times Dr. Rahman was listed as an attending physician on Code 99 sheets. Code 99 sheets, as noted above, contain information pertaining to emergency cardiac arrests, i.e. "Code Blues." The chart also lists the total number of Code Blues that occurred at the Jackson Park Hospital each year from 1979 to 1987 (as of November 22, 1987). Paul Revere claims that the "fact that Rahman responded to less than ten percent of the total number of Code Blues during the four years prior to his accident, however, materially contradicts his self-serving claim that an essential aspect of his cardiology emergency practice was running to patients in cardiac distress to administer appropriate emergency cardiac treatment." (Am.Resp. at 10). The trouble, however, with statistical evidence is that its presentation without other relevant variables negates its relevancy. First, we observe that patients in the hospital, presumably, are likely to suffer cardiac arrests at any time over a 24–hour period. There is no evidence as to how long Dr. Rahman worked and how many days he worked. He obviously could not respond to Code Blues when he was not present in the hospital. Additionally, there is no indication that Dr. Rahman was the only physician responding to Code Blues when he was on duty. Accordingly, the statement that he responded to only 10% of the Code Blues over a four-year period does not prove that Dr. Rahman did not need to run to his patients. Accordingly, it fails to contradict the only evidence we have of the nature of Dr. Rahman's pre-injury practice which is from Dr. Rahman.

Additionally, even if we assume it did prove that Dr. Rahman did not run very often, that still would not mean that running was not a "substantial and material" duty of the way he performed his emergency cardiac practice in the "usual and customary" manner. If Dr. Rahman testifies, as he did, that running is a substantial and material aspect of his practice, the fact that he did not have to do it every other minute he was on duty does not contradict his

statement. Evidence that he did other things which took up more of his time or were more important to his practice, if they were presented, might controvert his statement. However, the mere presentation of figures, standing alone, does nothing. If all Dr. Rahman did was respond to the limited number of Code Blues and nothing else, which is all the evidence we have, running would be a substantial and material duty of his regular practice.

We observe there is evidence that, during a two-year period, 1986 through 1987, after the injury, Dr. Rahman saw 1,391 patients at his office and 4,785 patients at Jackson Park Hospital.[6] If Paul Revere provided information on how many different non-Code Blue patients Dr. Rahman had seen each year prior to his injury and that number was significantly more than his Code Blue patients, then we may have been able to find that there is a question of fact whether his 83 Code Blue attendances over a four-year period were a substantial and material part of his practice. Paul Revere, however, has not included any evidence concerning the number of patients Dr. Rahman saw in addition to or even including his Code Blue patients prior to his accident. Accordingly, we find that Dr. Rahman's statement that an essential aspect of his pre-injury emergency cardiology practice was to run to his patients is uncontroverted.

### III

Finally, Paul Revere contends that even if Dr. Rahman is disabled, he is not entitled to a lump sum payment. Paul Revere argues that because the policy insured Dr. Rahman only against injury or sickness resulting in continuous total disability, Dr. Rahman is required to (a) send to Paul Revere a monthly progress report prepared by his attending physician and (b) submit to a physical examination as often as may reasonably be required during the pendency of his claim.

---

**6.** We note that Paul Revere does not indicate whether these were 6,176 different patients or whether Dr. Rahman saw only 1,000 different patients about six times each.

■ The position that Dr. Rahman send monthly progress reports from his attending physician is apparently based on the clause in the policy that payments are only payable if there is continuous total disability that "requires the regular and personal attendance of a licensed physician." (Defendant's Exhibit C, A–6). The Seventh Circuit has recently construed identical language in a disability policy in *Heller v. Equitable Life Assurance Society*, 833 F.2d 1253 (7th Cir.1987). The Court indicated that all that language requires is "that the insured is obligated to periodically consult and be examined by his or her treating physician at intervals *to be determined by the physician*." *Heller*, 833 F.2d at 1257 (emphasis added). Accordingly, in the absence of any direct language in the policy, we reject Paul Revere's arbitrary requirement that Dr. Rahman go to his doctor every month and submit a report.

■ As to the second requirement that Dr. Rahman submit to a physical examination during the pendency of his claim, we find this is supported by the policy provided Paul Revere pays all expenses:

> *Physical Examinations and Autopsy.* The Company *at its own expense* shall have the right and opportunity to examine the person of the insured when and as often as it may reasonably require during the pendency of a claim hereunder and to make an autopsy in case of death where it is not forbidden by law.

(Defendants' Exhibit C at A–9) (emphasis added).

Dr. Rahman provides no explanation for his position that he is entitled to a lump sum payment. Because we agree with Paul Revere that the policy only contemplates periodic payments during the pendency of a continuous disability, we reject Dr. Rahman's position that he is entitled to a lump sum payment of all currently due and future payments.

However, because we conclude that there is no question of material fact as to whether Dr. Rahman was disabled within the terms of the policy since the discontinuation of payments as of June 24, 1986, Dr. Rahman is entitled to a lump sum payment of all past due payments. Accordingly, we conclude Dr. Rahman is entitled to a payment of $42,000, representing $2,000 per month for the twenty-one month period of July 1986 to March 1988.

## IV.

In summary, we conclude that as of the time of Dr. Rahman's injury in February 1983, his "regular" occupation, as used in the disability policy, was as an emergency cardiologist for the Jackson Park Hospital. We also conclude that Paul Revere has failed to raise a question of fact as to whether Dr. Rahman has a physical limitation affecting his ability to run to his emergency cardiac patients. Paul Revere has also failed to raise a question of fact as to whether a material function, duty or responsibility of Dr. Rahman's regular occupation as an emergency cardiologist was to run to his patients. Accordingly, we find that Dr. Rahman is entitled to summary judgment on the issue of his total disability since June 24, 1986, under the terms of the Paul Revere disability policy.[7] The clerk is directed to enter a judgment in the amount of $42,000 in favor of plaintiff Dr. Syed E. Rahman.[8] It is so ordered.

7. Dr. Rahman also seeks summary judgment on the ground that Paul Revere is estopped from claiming there exists a question of material fact at this stage of the proceeding because of its open court admission on February 10, 1987, that this case could be resolved on cross-motions for summary judgment. Dr. Rahman contends that Paul Revere is bound by that statement either as a judicial admission, representation by an agent or as a sanction under Fed.R. Civ.P. 11. Because we conclude that Dr. Rahman is entitled to summary judgment on the merits, we decline to address these arguments.

8. In our June 29, 1987 order, we held that Paul Revere had violated Fed.R.Civ.P. 11:

> Additionally, we observe that Paul Revere has violated Fed.R.Civ.P. 11 by denying the appli-

cability of the Rider to Dr. Rahman's insurance policy in its answer (Answer ¶ 3) when it now concedes that the Rider applies to this case. A reasonable inquiry into the facts of this case prior to the filing of its answer would have revealed the applicability of the Rider.

We then indicated that, to the extent Paul Revere's failure caused Dr. Rahman to incur un-

necessary attorney fees, we would allow Dr. Rahman to recover such fees from Paul Revere. Dr. Rahman requested that he be allowed to submit a petition for fees upon resolution of the present motion for summary judgment. Accordingly, Dr. Rahman is directed to file a fee petition within ten days of the date of this opinion. Paul Revere may respond within five days thereafter, if it so chooses.