WILLIAM C. LANG, Plaintiff-Appellant, *v.* MONARCH LIFE INSURANCE COMPANY, Defendant-Appellee.

Third District   No. 79-156

Opinion filed August 29, 1979.

Fred A. Bernardi, of Bernardi, Ault & Bode, of Pekin, for appellant.

Rodney Hallberg, of Elliff, Keyser & Hallberg, of Pekin, for appellee.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Plaintiff William C. Lang appeals from a judgment entered adversely to him in an action against his insurance carrier, defendant Monarch Life Insurance Company. There is no dispute as to the essential facts of Mr. Lang's disabled condition and the only question for the court was one of law concerning the construction of the insurance contract. The issue is whether a "rider" to the insurance contract, which provides for lifetime payments in the event the insured loses the "total and irrecoverable * * * use of both feet," would be construed to give coverage to Lang in his disabled condition. The trial court determined that Lang's disabilities, which prevented him from returning to his regular occupation, were not covered by the limiting language involving the "total and irrecoverable loss of the use of both feet," which appears in the rider. Judgment was entered for the defendant-company as a result of section 64(3) motion for judgment. (Ill. Rev. Stat. 1977, ch. 110, par. 64(3).) Lang contends, on

appeal, that the trial court erred in its construction of the contract and in its consequent entry of judgment for the defendant.

As noted, the facts in this case are not in dispute. In 1967, Lang entered into an insurance contract with Monarch Life. Parts 1 and 2 of the policy provided for monthly "indemnity" payments to Lang in the event he was totally disabled by sickness or injury. Those parts defined "total disability" with reference to an insured's ability to engage in gainful occupation for which he is reasonably fitted by education, training and experience. In the event of such total disability, caused by accident, the policy provided for $300 monthly payments for a maximum period of five years. Part 2 of the policy, and the policy schedule to which it refers, sets forth the nature and timing of the payments.

Another pertinent provision of the policy, Part 3, entitled "Benefits for Specific Loss," states that if injuries result in the

> "* * * total and irrecoverable loss (by actual severance or otherwise) of the use of * * * both feet * * * then for as long as the loss continues the Insured will be deemed to be totally disabled regardless of his ability to engage in any occupation * * *."

Also attached to the basic policy provisions was an L B rider (lifetime benefits) which provided, in pertinent part, that if injuries resulted in the

> "* * * total and irrecoverable loss * * * (by actual severance or otherwise) of the use of * * * both feet * * * then the indemnity provided by Section A of Part 2 of this policy will be payable for as long as such loss continues during the lifetime of the Insured, regardless of the Maximum Indemnity Period specified in the Policy Schedule."

There was also a P C rider attached to the policy which, in its pertinent part, provided for a lump sum payment to the insured in the event that both feet were actually severed. Other portions of the policy are not pertinent to the issue raised on appeal.

In October of 1972, while he was engaged in his occupation as a plasterer, William Lang fell from a scaffold and sustained serious injury to his back and hips. Since the fall, he has had difficulty walking and moving about. He has been unable to engage in activities requiring any strenuous use of his lower extremities. He has been physically unable to return to his previous occupation as a plasterer. The evidence indicated that Lang suffers considerable pain when walking even short distances and that he must use the aid of a cane. He needs similar support in effecting most movements. He has been unable to cross his legs for six years and experiences extreme pain when squatting. He can only drive short distances in his automobile and then must manually move his leg from accelerator to brake. Any lifting is painful for him, and he is restricted to the most limited manual tasks (occasionally helping with light household

chores). He cannot climb a ladder and has difficulty dressing himself. His only education, training and experience, occupationally, have been in the manual trades, specifically laboring and plastering. It is, therefore, clear from the record that he is severely disabled and can no longer engage in such occupations as a result of his disabilities.

An orthopedic surgeon, testifying as to Mr. Lang's problems, concluded that Lang was suffering from a degenerative bilateral aseptic necrosis of the femur bone, combined with narrowing of the joint space in the hip. Essentially, both hip joints are severely damaged. The doctor noted that there was a surgical procedure available, the replacement of the hip joints, which would result in the alleviation of some of the pain and in an increase in mobility for the hip. The doctor noted, however, that even after successful hip replacement surgery, Lang would be unable to return to any strenuous activities. Mr. Lang indicated that unless the pain became unbearable he did not intend to have the surgery performed. The doctor testified that he had successfully performed the surgery a number of times but that it was expensive and involved potential complications. Mr. Lang is 40 years old and has a wife and three children.

Under the terms of the policy in Parts 1 and 2, Mr. Lang received monthly disability payments of $300 for the maximum five-year period specified in the policy schedule. In October 1977, the insurer stopped making payments. Plaintiff Lang then brought the present action, claiming that further payments had become due him under the "total and irrecoverable loss of the use of both feet" coverage provided in the L B rider. The trial court, as we have noted, entered judgment against Lang at the close of this case and found, as a matter of law, that the L B rider did not afford coverage to Lang.

■■■ The basic rules with respect to construction of insurance contracts are well established. As noted in *J. M. Corbett Co. v. Insurance Co. of North America* (1976), 43 Ill. App. 3d 624, 626, 357 N.E.2d 125:

> "[W]here a contract of insurance consists of a policy and other papers or documents, executed as a part of one transaction and accompanying the policy or incorporated therein by attachment or reference, they must be construed together in order to determine the meaning and effect of the insurance contract. [Citations.]" (See *Weiss v. Bituminous Casualty Corp.* (1974), 59 Ill. 2d 165, 171, 319 N.E.2d 491.)

In the instant case, we must look to the basic policy provisions and the rider attached thereto in construing the language used therein. Other rules applicable to construction of insurance contracts were concisely set forth in *Olipra v. Zambelli* (1971), 1 Ill. App. 3d 607, 609-10, 274 N.E.2d 877:

> "The primary object in the construction of an insurance policy is to ascertain the intention of the parties as expressed in the language

of the contract. [Citations.] If the words of the policy are clear and unambiguous the court without consideration of matters extrinsic to the contract should give effect to the plain and obvious import of the language used unless such construction would lead to unreasonable or absurd consequences. [Citations.] On the other hand if the terms and provision of a policy [are] ambiguous and uncertain, the court, in determining the significance to be given to the ambiguous and uncertain portions, should consider the purpose sought to be accomplished, the situation of the parties, the subject matter of the contract and the circumstances surrounding the issuance of the policy. [Citations.]"

The rules with respect to the construction of ambiguous and uncertain provisions were also stated in *Corbett Co. v. Insurance Co. of North America* (1976), 43 Ill. App. 3d 624, 626-27:

"The fundamental law of construction in insurance contracts is that all uncertainty should be resolved in favor of the insured. [Citation.] So, where ambiguity exists in an insurance contract [citation], or where an equivocal expression is included narrowing the range of liability, the language used will be liberally construed to effectuate indemnification. [Citations.]"

The threshold question, and the dispositive one, is whether the language of the policy with respect to coverage in the event of the total and irrecoverable loss of the use of both feet is "ambiguous or uncertain." The defendant insurer argues that the language is plain and clear in its meaning and that a loss of the use of both feet, for all purposes, is required before the lifetime benefits under the L B rider are payable. Counsel for Mr. Lang admits of the viability of such construction, but he argues that it is not the plain and clear meaning of the language used. Rather, he asserts, the language is ambiguous because it is capable of being reasonably construed to mean a loss of use such that the insured is unable to engage in his regular occupation. It is contended that a consideration of the whole of the policy provides a sufficient foundation for the latter construction.

We are required to examine the entire policy, in its pertinent parts, to answer the question as to the existence of ambiguity or uncertainty in the language at issue. (*Weiss v. Bituminous Casualty Corp.* (1974), 59 Ill. 2d 165, 319 N.E.2d 491.) An examination of the policy discloses that the principal focus of Parts 1 and 2 is indemnity for occupational disability. Part 1, the definitional portion, states that an insured will be deemed to be totally disabled when, by reason of sickness or injury, "he is completely unable to engage in gainful occupation for which he is reasonably fitted by education, training and experience." Part 2 of the policy sets forth the

timing and the rate of payments to an insured in the event of such total disability. Part 3, entitled "Benefits for Specific Loss," provides:

> "If, while this insurance is in force, such sickness or such injuries shall result in total and irrecoverable loss of sight or speech or hearing, or in total and irrecoverable loss (by actual severance or otherwise) of the use of both hands, both feet, or a hand and a foot, then for as long as the loss continues the Insured will be deemed to be totally disabled regardless of his ability to engage in any occupation and regardless of whether or not regular attendance by a physician is required. * * *"

Thus, in Part 3, disability coverage, for the purposes of initial benefits, is expanded to include a situation wherein the insured loses the use of both feet, regardless of his ability to engage in his occupation. The L B rider, entitled "Rider Providing Lifetime Indemnity Benefits for Specific Loss," states:

> "If, while this insurance is in force, such sickness or such injuries shall result in total and irrecoverable loss of sight or speech or hearing, or in total and irrecoverable loss (by actual severance or otherwise) of the use of both hands, both feet, or a hand and a foot, then the indemnity provided by Section A of Part 2 of this policy will be payable for as long as such loss continues during the lifetime of the Insured, regardless of the Maximum Indemnity Period specified in the Policy Schedule."

There is also another rider which provided for a lump sum payment in the event of actual severance of both feet, both hands, or a hand and a foot.

■■ After examining the policy in its entirety, with focus upon the pertinent language in the L B rider, we find that the circuit court was correct in its conclusion that the language is clear and unambiguous and that the insured's injuries and disabilities did not come within the limited coverage provided herein. The appellant Lang correctly notes that the question which must be answered is what types of losses of use are covered by the L B rider. He concludes, in response to the question, that the policy is ambiguous. Counsel argues that it could be construed to be a loss of use for all purposes or a loss of use for his occupational purposes. We do not agree. The types of losses of use covered in the rider are clearly set forth. The words "loss of use" have two modifying adjectives when used in the rider. Those two modifying adjectives are "total" and "irrecoverable." They describe the type of loss of use which is covered by the rider, and their plain and unambiguous meanings denote a loss of use both complete and permanent. In addition to this plain and obvious meaning, there is nothing in the rider itself to indicate, or even suggest, that the specific losses of use described therein are related to occupational

disability. Indeed, in Part 3, the first section of the policy dealing with the specific losses described, the meaning of "total and irrecoverable loss of use" is specifically stated to be divorced from any considerations of occupational disability. There is no indication that any change in the meaning of the "total and irrecoverable loss of use" language is intended when that same language is used in the L B rider which, as Part 3, also addresses specific losses. We find that both the plain meaning of the language and its previous use in the contract all indicate that what was intended to be covered in the L B rider was the complete and permanent loss of the use of both feet, and coverage was thus specifically limited.

■ We are mindful of the appellant's plight and of equitable considerations sympathetic to his position in this matter. We are authorized to apply a liberal construction to language in insurance contracts so that, in appropriate cases, coverage is extended to the insured. However, in this case and the contract at issue herein, we would be overreaching and departing from the plain meaning of the language used were we to conclude that the language referred to can reasonably be construed to mean a loss of use for occupational purposes. Such a conclusion goes directly contrary to the express language used and has little foundation to support it. While Parts 1 and 2 address themselves to occupational disability, the language in the provisions concerning specific losses (Part 3 and the L B rider) does not evidence any adoption of an occupational standard. If such standard were intended, the language could have been expressly so stated as it was in other clauses of the policy. As noted previously, the language used (in Part 3 and the L B rider) indicates a contrary meaning. While Section A of Part 2 is referred to in the rider, that section deals with procedural matters concerning timing and rate of payments. It does not contain any substantive matters concerning the definition of disability found in Part 1. Thus, when the L B rider refers to Section A of Part 2, it does so to specify the nature and manner of the lifetime payments. The reference does not suggest any intention to provide an occupational disability meaning in the substantive parts of the L B rider. Nor can we find anything elsewhere in the policy as a whole which indicates that the words used in the L B rider should receive anything but their plain and obvious meaning.

We have concluded that the circuit court was correct in finding that there was no ambiguity in the language at issue and that the policy required the total and irrecoverable loss of the use of both feet before lifetime benefits would be paid. It is conceded that the facts are clear that Mr. Lang, while seriously disabled, has not totally and irrecoverably lost use of both his feet. The record shows he is able to walk and drive an automobile, albeit with difficulty and pain. He also does minor household chores with the use of his legs.

Given the facts, the Circuit Court of Tazewell County was correct in its decision to deny policy coverage, based upon the language used in the L B rider, for lifetime benefits. Its decision, granting judgment for the defendant, is, therefore, affirmed.

Affirmed.

STENGEL and SCOTT, JJ., concur.