**Douglas S. WINTER, Plaintiff–Appellant,**

v.

**MINNESOTA MUTUAL LIFE INSURANCE COMPANY, Defendant–Appellee.**

No. 99–1031.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1999.

Decided Dec. 3, 1999.

Alan Rhine (argued), Chicago, IL, for
Douglas S. Winter.

Catherine A. Nelson (argued), Blatt, Hammesfahr & Eaton, Chicago, IL, for Minnesota Mutual Life Ins. Co.

Before BAUER, FLAUM and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Douglas Winter brought this action against Minnesota Mutual Life Insurance Company[1] ("Minnesota Life") for disability benefits under his insurance policy. Mr. Winter had worked as a trader in the "pit" of the Chicago Board of Options Exchange ("CBOE"), but became disabled due to headaches and stomach pains, for which Minnesota Life paid him disability benefits. After several months, Minnesota Life discontinued Mr. Winter's benefits because it claimed it had insufficient evidence of his disability. Pursuant to a request for information by Minnesota Life, one of Mr. Winter's doctors stated that Mr. Winter's condition precluded employment while another doctor replied that Mr. Winter reported chronic headaches that interfered with his ability to work. However, Minnesota Life still denied coverage. During this time Mr. Winter began trading stocks and options by computer.

Several months later, Mr. Winter visited a specialist for a throat condition and notified Minnesota Life that he was disabled from pit trading due to his throat problem. Minnesota Life denied Mr. Winter benefits and stated that his throat problem did not prevent him from computer trading and that he was not disabled.

Minnesota Life argues that Mr. Winter's regular occupation is that which he was doing at the time of his sickness: computer trader. Because his throat problem does not affect his computer trading, Minnesota Life maintains that he is not disabled. Conversely, Mr. Winter argues that his regular occupation is the one listed in his policy: pit trader. He argues that his throat problem prevents his work as a pit trader and that he is therefore disabled. Alternatively, he claims that his sickness continued past the date determined by Minnesota Life and, therefore, he should recover his benefits.

The district court granted summary judgment for Minnesota Life and found that Mr. Winter's regular occupation was the occupation he was engaged in at the time of his sickness. Because at that time he was computer trading, which a throat condition does not affect, the court determined that Mr. Winter was not disabled. The court did not address whether Mr. Winter's stomach and head pains continued past the date determined by Minnesota Life.

We believe the term "regular occupation," as defined in Mr. Winter's insurance policy, is unambiguous and is the occupation Mr. Winter was employed in at the time of his sickness. However, we also believe Mr. Winter presented a triable issue of fact on the issue of the continuation of his disability. Mr. Winter may be able to convince the trier of fact that his stomach and head pains continued past the date determined by Minnesota Life, thus allowing him benefits for a continuing or recurrent disability. Therefore, we reverse the district court decision and remand for reconsideration in light of our following opinion.

**I**

**BACKGROUND**

Mr. Winter obtained a disability insurance policy with Minnesota Life in 1983. In his application for the policy, Mr. Winter listed his occupation as a stock options trader.[2] He kept that occupation for the

---

1. Minnesota Mutual Life Insurance Company changed its name to Minnesota Life Insurance Company in the course of the litigation.

2. On June 17, 1987 the policy was reissued. In this application Mr. Winter termed his occupation to be an options trader.

next 12 years. As a stock options trader, he traded options in the pit at the CBOE. In the pit, he used his voice and hands to make trades.

### A.

At the outset of our consideration of this case, we set forth the provisions of the disability insurance policy[3] that determine the scope of Minnesota Life's obligations to its insured, Mr. Winter.[4]

The policy explains that "[w]henever we use the word 'disability' or 'disabled' in this policy we mean that due to sickness or injury you are unable to perform the substantial and material duties of your regular occupation."[5] R.19, Ex.1 at 5. The policy defines "sickness" as "a disease or illness which is treated or diagnosed while this policy is in force." R.19, Ex.1 at 6. The policy also defines the words "regular occupation." It states that "[w]henever we use the words 'regular occupation' in this policy, we mean your occupation or profession, including your specialty as listed in the Specialty Endorsement attached to this policy." R.19, Ex.1 at 8.

The policy further provides that if Mr. Winter becomes disabled, but enters a different occupation while still disabled, he will continue to receive the benefits from his original occupation. The policy states:

> What if you engage in a different occupation while you are still disabled?
>
> If you work on a part-time or full-time basis in a different occupation while you are still disabled, you will continue to be eligible to receive the full monthly income benefit, regardless of your earnings in that new occupation.

R.19, Ex.1 at 7. Similarly, the policy explains:

> What if you engage in your regular occupation while you are still disabled?
>
> If you work in your regular occupation while you are still disabled, you will be eligible to receive a benefit, if you are unable, due to your continuing disability, to earn from your regular occupation more than 50% of your prior average earned income.

R.19, Ex.1 at 7.

Finally, the policy states that if the insured has a recurrent disability he can relate the second period of disability back to the first and recover benefits under the terms of the initial disability. Under the policy, "[a] recurrent disability is a period of disability which results from the same or related cause or causes as a previous period of disability." R.19, Ex.1 at 10. The benefits to be paid for a recurrent disability are listed in the policy as follows:

> What benefits will be paid for a recurrent disability?
>
> If, following a period of disability, you return to or are able to return to your regular occupation for a continuous period of six months or more, any recurrent disability will be considered a new disability. However, if you engage in your regular occupation for less than six months, any recurrent disability shall be

---

**3.** As written in the policy document, the questions and titles in the policy are in bold type; however, for the ease of the reader we have eliminated the bold type in this opinion.

**4.** Under the title "General Information," the policy states that "[t]his policy and the copy of your application attached to it contain the entire contract between you and us." R.19, Ex.1 at 12.

**5.** The policy includes the following pertinent provisions:

The substantial and material duties [of your regular occupation] are those duties which account for 50% or more of your prior average earned income from your regular occupation.
R.19, Ex.1 at 7.
The policy defines "prior average earned income" as follows:
The monthly average of your earned income for the 12 month period, or the preceding 24 months if higher, immediately prior to the onset of your disability.
R.19, Ex.1 at 7.

considered a continuation of the preceding period of disability.

R.19, Ex.1 at 10.

## B.

### 1.

Beginning in 1991, Mr. Winter experienced almost daily headaches. His general physician, Dr. Rosenbaum, referred him to Dr. Heller, a neurologist. Dr. Heller could not pinpoint the exact cause of the pain, but stated that it was consistent with muscle contraction or tension headaches and recommended a mild treatment for Mr. Winter. Notably, Dr. Heller also observed and documented Mr. Winter's mild hoarseness, probably due to Mr. Winter's occupation. From 1991 through 1995, Dr. Heller treated Mr. Winter several times per year for his headaches.

In 1993, Mr. Winter began experiencing stomach pains in addition to his headaches. In 1994, again on referral from Dr. Rosenbaum, Mr. Winter visited Dr. Sparberg, a gastroenterologist. This physician noted that Mr. Winter's stomach pains prevented him from sleeping on his stomach, that the pain worsened when he was nervous, and that his stomach felt better on the weekends.

On March 8, 1995, Mr. Winter stopped working in the pit at the CBOE because of his head and stomach pains. He informed Minnesota Life of his ailments and of his inability to perform at his job. Minnesota Life then requested doctors' reports, to which Drs. Rosenbaum, Heller, and Sparberg replied.

On the form supplied by Minnesota Life, the general physician, Dr. Rosenbaum, listed Mr. Winter's disability as head pain and abdominal pain. His report stated, in truncated and somewhat confusing fashion, that the disability was possibly related to Mr. Winter's employment, that Mr. Winter was not disabled from his regular work, but that he was disabled from other gainful work. Also, Dr. Rosenbaum wrote that he did not expect a change in Mr. Winter's condition in the future because Mr. Winter's stress and job would not change.

The neurologist, Dr. Heller, reported Mr. Winter's disability as headaches, "mental fogginess," and fatigue. He attributed this condition to Mr. Winter's employment and also remarked that Mr. Winter believed his symptoms related directly to his work activities.

Finally, the gastroenterologist, Dr. Sparberg, described Mr. Winter's disability as a spastic stomach. Based on one visit with Mr. Winter in 1994, he marked Mr. Winter as disabled from his regular work, but with the expectation of improvement in his condition within 4–6 months. He also explained that Mr. Winter's stress-induced abdominal pain was not "amicable" to Mr. Winter's regular work.

Based on these physicians' reports, Minnesota Life allowed Mr. Winter's claim and related the claim back to the date he had stopped working in March. However, in an October 5, 1995 letter, Minnesota Life informed Mr. Winter that it would not continue his benefits past August 31, 1995, and stated that the information provided to Minnesota Life did not substantiate his disability beyond those periods already paid, March 8 to August 31. Minnesota Life advised Mr. Winter that it would request information about Mr. Winter's condition from Drs. Rosenbaum and Heller and further apprised Mr. Winter that his claim remained open pending the physicians' replies.

The general physician, Dr. Rosenbaum, responded to Minnesota Life's request and stated that the current diagnosis for Mr. Winter's condition was stress reaction, esophagitis, and reflux. He further stated that stress-related headaches and abdominal pain precluded Mr. Winter from being active in his occupation.

The neurologist, Dr. Heller, also responded to Minnesota Life's request. He noted that Mr. Winter reported chronic headaches that interfered with his ability to perform his usual work-related activi-

ties. Dr. Heller also stated that Mr. Winter had difficulty handling the stresses of his occupation, that he reported headaches, stomach pains, and a racing heart, and that the symptoms could persist indefinitely.

Meanwhile, in November of 1995, Mr. Winter started computer trading. He trained himself in the field, rented office space, and began trading stocks over the computer.

On December 18, 1995, Minnesota Life wrote to Mr. Winter and denied his claim for benefits based on insufficient evidence of his disability.

### 2.

In April of 1996, Mr. Winter, on referral from Dr. Rosenbaum, had an initial appointment with Dr. Hanson, an otolaryngologist, about throat pain he was experiencing. Dr. Hanson reported Mr. Winter's condition as throat pain, soreness, dryness, and hoarseness. Over the course of Dr. Hanson's visits with Mr. Winter, Dr. Hanson noted the inflammation of Mr. Winter's vocal cords and his significant reflux symptoms. In June 1996, Mr. Winter also visited the gastroenterologist, Dr. Sparberg. Doctors Hanson and Sparberg treated Mr. Winter for severe reflux disease.

In a letter to Minnesota Life dated August 15, 1996, Dr. Hanson described Mr. Winter's condition as chronic irritative laryngitis, due to reflux disease. He explained that Mr. Winter's duties as a pit trader, and the use of his voice in that work, progressively damaged his vocal folds and resulted in permanent scarring. This activity exacerbated the damage to his larynx from reflux acid. Notably, the reflux also stemmed from the stressful atmosphere of pit trading. Coupled with the yelling required of his position, this condition had caused the permanent scarring.

Finally, Dr. Hanson concluded that Mr. Winter's condition disabled him from performing his duties as a pit trader.

In December of 1996, despite Dr. Hanson's reports of a throat condition, Minnesota Life denied Mr. Winter's renewed claim for disability benefits. Minnesota Life took the position that the head and stomach pains were a distinct disability from the throat pains and hoarseness. Although Mr. Winter stopped pit trading due to his headaches and stomach pains, Minnesota Life notified Mr. Winter that it did not have sufficient medical verification of those problems beyond August 31, 1995. This date, therefore, marked the end of his "first" disability. According to Minnesota Life, when Mr. Winter first visited Dr. Hanson for his throat problem, his "second" disability, he had been away from pit trading for over one year. In Minnesota Life's view, at the time of his laryngitis condition, Mr. Winter was not employed in any occupation[6] and, therefore, his throat condition could not impair his duties in performing a regular occupation. Furthermore, Minnesota Life informed Mr. Winter that he did not have a recurrent disability as defined in the policy because he did not have medical verification of the voice condition within six months from the last disability payment of August 31, 1995. But according to Minnesota Life, if Mr. Winter could establish that he received medical treatment for his voice condition within six months of August 31, 1995, he could recover benefits for a recurrent disability.

### C.

Before the district court, Mr. Winter claimed that he was entitled to benefits from August 31, 1995 to the present because he is disabled from his regular occupation as a pit trader. On summary judgment, the district court determined that Mr. Winter's occupation on March 8, 1995,

---

6. Minnesota Life, at this time, was unaware that Mr. Winter had begun computer trading in November.

the day he stopped working at the CBOE, was a stock options trader. The court further determined that Mr. Winter had stopped working because he could not endure his headaches and stomach pains and that, therefore, he was entitled to receive benefits from Minnesota Life from March 1995 until August 31, 1995, when Minnesota Life determined his disability had ended. The district court never addressed the issue of whether Mr. Winter's disability continued past August 31, 1995.

Turning to the terms of the policy, the court found no ambiguity in its terms. The policy could not be canceled, but the insured could change his occupation at will. The court therefore determined that Mr. Winter's regular occupation, as defined in the policy, is the occupation he engaged in at the time he became disabled, not the occupation listed in the application. The court further found that, while Mr. Winter worked as a pit trader, he became disabled due to headaches and stomach pains. After that disability ended in August 1995, he changed his regular occupation to computer trader. Thereafter, his voice problems manifested. The court stated that, although the voice condition would have disabled him from pit trading, he no longer worked as a pit trader. The court concluded that the voice problem does not affect his computer trading and therefore, it does not disable him from his regular occupation.

The district court acknowledged that the vocal disability preventing Mr. Winter from returning to the pits may have had its origin in the ailments he suffered while working in the pits, but this disability did not exist, for the policy's purpose, until he lost his voice. By that time, he had stopped trading in the pit and had begun computer trading. However, the court did state that "[t]he condition of Winter's larynx is related to the stomach disorder which included reflux; the acid from his

stomach scarred his vocal cords." *Winter v. Minnesota Mut. Life Ins. Co.*, No. 97 C 2256, 1998 WL 887091, at *2 (N.D.Ill. Dec.10, 1998). Still, the loss of his voice did not disable him from computer trading, the court concluded; therefore, he cannot receive benefits for his disability under Minnesota Life's policy.

## II

## DISCUSSION

### A.

#### 1.

■ The parties dispute the applicable standard of review. Mr. Winter claims that the standard should be de novo because this case presents a question of contract construction on a motion for summary judgment. Minnesota Life submits that this case involves only the application of facts to a legal standard and therefore ought to be reviewed under the "clearly erroneous" standard. In *Jurcev v. Central Community Hospital*, 7 F.3d 618, 623 (7th Cir.1993), *cert. denied*, 511 U.S. 1081, 114 S.Ct. 1830, 128 L.Ed.2d 459 (1994), this court stated that the "clearly erroneous" standard ought to be applied in those summary judgment situations in which the only question before the court is the application of facts to a legal standard.[7] More precisely, in *Jurcev*, the court recognized that some of our more recent cases had employed the "clearly erroneous" standard in cases in which "(1) the facts are undisputed, (2) the trial court is merely applying the law to the facts, and (3) the nonmoving party has made no request for a jury trial." *Id.* at 623. In *Jurcev*, the court articulated concern about the appropriate application of this new standard, a concern that we heed today. Assuming, as these cases do, that the "clearly erroneous" standard is appropriate in a summary judgment situation in which the court's task is

---

7. *See also Central States, Southeast and Southwest Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 792 (7th Cir.1992).

limited to applying facts to a legal standard, we must take care that this approach does not spread its dominion to other situations in which the rationale that supports its application is not present.[8]

This case certainly ought not be reviewed under the "clearly erroneous" standard. First, although the parties agree that the insurance policy governs, the facts are disputed as to the continuation of Mr. Winter's disability. *See International Union of United Auto., Aerospace and Agric. Implement Workers v. Randall Div. of Textron, Inc.*, 5 F.3d 224, 228 n. 3 (7th Cir.1993) (holding that the clear error standard of review is inapplicable because, inter alia, the parties did not stipulate to the facts but rather disputed them). Second, this case involves contract interpretation, a question of law. *See Employers Ins. of Wausau v. James McHugh Constr. Co.*, 144 F.3d 1097, 1104 (7th Cir. 1998) ("The construction of an insurance policy is a question of law, which this court undertakes de novo.") (citation omitted); *Church v. General Motors Corp.*, 74 F.3d 795, 799 (7th Cir.1996) ("Traditionally, the interpretation of an unambiguous contract is a question of law."). Third, even if the first two prongs of *Jurcev* were met, the final prong is not. Despite Minnesota Life's argument to the contrary, Mr. Winter properly requested a jury trial and did not waive his jury demand.

At oral argument, Minnesota Life urged this court to find that Mr. Winter lacked a valid jury demand, based on its three arguments: Mr. Winter did not include a jury demand in the record; Mr. Winter improperly filed his jury demand; and Mr. Winter waived his jury demand. Minneso-ta Life argues that if any one of these three contentions proves true, then Mr. Winter does not have a valid jury demand. We do not think that Minnesota Life's arguments have merit.

First, Minnesota Life argues that a jury demand was not included in the record. However, Mr. Winter filed a jury demand in state court before Minnesota Life removed the case to federal court. When Minnesota Life removed the case to federal court, Mr. Winter's jury demand was automatically preserved if it complied with Illinois law. Federal Rule of Civil Procedure, Rule 81 provides that "[a] party who, prior to removal, has made an express demand for trial by jury in accordance with state law, need not make a demand after removal." Fed.R.Civ.P. 81(c). Therefore, the jury demand is presumably included in the state court record, as evidenced by the stamp of "JURY DEMAND" on the removal papers in the federal court record.

Second, Minnesota Life claims that, even if Mr. Winter filed a jury demand in state court, that jury demand was not valid under state law, as required by Rule 81(c). Minnesota Life states that Mr. Winter does not have a valid jury demand under Illinois law because the copy of the jury demand included in Mr. Winter's reply brief does not include a certificate of service. We do not have the state trial court record before us and therefore cannot determine definitively whether Mr. Winter did in fact include a certificate of service in the state court; however, even if Mr. Winter failed to attach a certificate of service in the state trial court record, Illinois law does not invalidate the jury demand.[9]

---

**8.** As Judge Manion pointed out in *St. Mary's Medical Center v. Disco Aluminum Products Co.*, 969 F.2d 585, 588–89 (7th Cir.1992), the "clearly erroneous" standard is appropriate when the district court merely applied the adjudicative facts of a case to a given legal standard because the district court is closer to the facts of the case and therefore better able to assess their legal significance. Secondly, an appellate court's primary function is to establish and to articulate legal rules, a function not directly at stake in the application of facts to a given legal rule.

**9.** The applicable Illinois statute states that "[a] plaintiff desirous of trial by jury must file a demand therefor with the clerk at the time the action is commenced." 735 Ill. Comp. Stat. Ann. 5/2–1105 (West 1992). Further-

 Finally, Minnesota Life submits that Mr. Winter waived his jury demand in the district court by failing to object when Minnesota Life presented its motion for summary judgment. In its motion for summary judgment, Minnesota Life asked the district court to act as the trier of fact, with the express statement that the court should hear the motion for summary judgment, look at the undisputed facts, and make ultimate conclusions. Mr. Winter did not object, and, because this circuit accepts as valid a waiver of a jury demand through a party's inaction or inadvertence, Minnesota Life claims that Mr. Winter waived his jury demand. Minnesota Life cites this circuit's precedent for the proposition that a party may waive its right to a trial by jury through inaction and inadvertence; however, the cases allowing such a waiver are not applicable to Mr. Winter. Only when a party does not reassert the right to a jury trial prior to a *bench trial* or *factual hearing*, requests a *bench trial*, or knowingly participates in a *bench trial*, does that party waive his right to trial by jury through inaction or inadvertence.[10] Mr. Winter's case was not decided by a bench trial, but rather on a motion for summary judgment, and parties do not waive their jury demand by moving for summary judgment.[11] Therefore, Mr.

more, Illinois Court Rule 104, states in pertinent part:

Rule 104. Service of Pleadings and Other Papers—Filing

. . . . .

(b) Filing of Papers and Proof of Service. Pleadings subsequent to the complaint, written motions, and other papers required to be filed shall be filed with the clerk with a certificate of counsel or other proof that copies have been served on all parties who have appeared. . . .

. . . . .

(d) Failure to Serve Copies. Failure to deliver or serve copies as required by this rule does not in any way impair the jurisdiction of the court over the person of any party, but the aggrieved party may obtain a copy from the clerk and the court shall order the offending party to reimburse the aggrieved party for the expense thereof.

Ill. Comp. Stat. S.Ct. Rule 104 (1993). Even if Mr. Winter failed to file a certificate of service, this defect does not injure his jury demand, but merely requires him to pay the copying costs of the jury demand, if Minnesota Life requested a copy. *Cf. In re Am. Mut. Reinsurance Co.*, 238 Ill.App.3d 1, 179 Ill.Dec. 200, 606 N.E.2d 32, 39 (1992) (holding that "failure to serve nonmoving party with notice renders a subsequent order based on that motion voidable rather than void"); *City of Chicago v. Exchange Nat'l Bank*, 133 Ill. App.2d 370, 273 N.E.2d 484, 486 (1971) (stating that the failure to serve notice of a motion in no way impaired the validity of the motion).

**10.** *See White v. McGinnis*, 903 F.2d 699, 703 (9th Cir.) (holding that knowing participation in a bench trial without objection constituted a waiver of the jury demand), *cert. denied*, 498 U.S. 903, 111 S.Ct. 266, 112 L.Ed.2d 223 (1990); *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1432–33 (7th Cir.1986) (stating that both parties' agreement at the status conference for the judge to determine the issue of liability based on the exhibits and depositions admitted into evidence, and the briefs and oral argument, coupled with the party's failure to object prior to the bench trial, resulted in a waiver of the jury demand); *National Family Ins. Co. v. Exchange Nat'l Bank*, 474 F.2d 237, 241 (7th Cir.) (explaining that the failure of a party to object before a factual hearing waives that party's jury demand), *cert. denied*, 414 U.S. 825, 94 S.Ct. 129, 38 L.Ed.2d 59 (1973); *Kahn v. General Motors Corp.*, 865 F.Supp. 210, 213 (S.D.N.Y.1994) (asserting that the party waived its jury demand by requesting a bench trial). *Cf. United States v. Taglia*, 922 F.2d 413, 416–17 (7th Cir.) (declaring that an initial motion to sever made before a trial but not acted on by the court and not renewed by the movant, was waived), *cert. denied*, 500 U.S. 927, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991).

**11.** There is a presumption against waiver of the constitutional right to trial by jury, *see Jennings v. McCormick*, 154 F.3d 542, 545 (5th Cir.1998) (explaining that courts must use every reasonable presumption against waiver of a jury demand); *Tray–Wrap, Inc. v. Six L's Packing Co.*, 984 F.2d 65, 68 (2d Cir.1993) (stating that conduct implying waiver of a jury demand "must be clear and unequivocal, as waivers are never to be lightly inferred"), and parties do not implicitly waive their jury demand by filing cross-motions for summary judgment if the motion is denied and the demand is not withdrawn, *see Clarin Corp. v. Massachusetts Gen. Life Ins. Co.*, 44

Winter's failure to object to Minnesota Life's motion for summary judgment, while submitting his own motion for summary judgment, is not a waiver of his jury demand. Mr. Winter still holds a valid jury demand, and thus *Jurcev*'s third prong is not satisfied.

We shall therefore employ the traditional de novo standard of review. On review, all facts are to be taken in the light most favorable to Mr. Winter and all inferences are to be drawn in his favor. *See Huntzinger v. Hastings Mut. Ins. Co.*, 143 F.3d 302, 307 (7th Cir.1998); *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir.1996), *cert. denied*, 520 U.S. 1230, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997). The purpose of summary judgment is to determine whether, based on the record, any material dispute of fact exists that requires a trial. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). Here, Minnesota Life has the burden of establishing the absence of a genuine issue of triable fact. *See Vance*, 97 F.3d at 991. However, Mr. Winter cannot rest on the pleadings and must come forward with sufficient evidence of a genuine issue of material fact. *See id.* A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict for Mr. Winter. *See id.*

### 2.

■■■■ When interpreting a contract, a court must interpret the contract as a whole and, therefore, give meaning to the words in the context of the contract as a whole. *See International Ins. Co. v. Peabody Int'l Corp.*, 747 F.Supp. 477, 480 (N.D.Ill.1990). Specifically, in construing an insurance contract, the instrument must be construed with due regard given to the risk undertaken, the subject matter that is

insured, and the purpose of the entire contract. *See Employers Ins. of Wausau*, 144 F.3d at 1104.

■■■■ To determine the meaning of a specific term, the court must first decide whether the term is ambiguous. A term is ambiguous only if it is subject to more than one reasonable interpretation, *see id.*; *Indiana Ins. Co. v. Liaskos*, 297 Ill.App.3d 569, 231 Ill.Dec. 844, 697 N.E.2d 398, 402 (1998); and a term is not ambiguous just because it is not defined in the policy, *see Indiana Ins. Co.*, 231 Ill.Dec. 844, 697 N.E.2d at 402. If the term is unambiguous, the court should employ the plain, ordinary, and popular meaning of the term. *See Employers Ins. of Wausau*, 144 F.3d at 1104; *Indiana Ins. Co.*, 231 Ill. Dec. 844, 697 N.E.2d at 401–02; *International Ins. Co.*, 747 F.Supp. at 480. If the term is ambiguous, the court must construe the term against the insurer and in favor of the insured. *See Employers Ins. of Wausau*, 144 F.3d at 1104; *Indiana Ins. Co.*, 231 Ill.Dec. 844, 697 N.E.2d at 402; *Lang v. Monarch Life Ins. Co.*, 75 Ill.App.3d 938, 31 Ill.Dec. 549, 394 N.E.2d 751, 753 (1979); *Bell v. Continental Assurance Co.*, 123 Ill.App.2d 274, 260 N.E.2d 114, 116 (1970).

### 3.

The parties disagree about the meaning of the term "regular occupation." Minnesota Life submits that "regular occupation" is unambiguous and must be interpreted to mean the occupation that Mr. Winter held at the time of his disability. Minnesota Life goes on to contend that, when his voice problem manifested, Mr. Winter worked as a computer trader and that therefore his regular occupation is a computer trader. Mr. Winter, on the oth-

F.3d 471, 473–74 (7th Cir.1994) (asserting that a party's "filing of a motion for summary judgment does not waive its right to a jury trial if the motion is denied" and thus refusing to apply the *Jurcev* clear error standard); *see also American Nat'l Bank and Trust Co. v. United States*, 832 F.2d 1032, 1036 (7th Cir.

1987) (explaining that filing a motion for summary judgment does not waive the movant's right to a trial); *May v. Evansville–Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1115 (7th Cir.1986) (holding that moving for summary judgment does not waive the right to a trial).

er hand, submits that "regular occupation" is ambiguous and therefore should be construed in his favor. He claims his regular occupation should be the one stated as his occupation in the policy, a stock options (pit) trader. Therefore, he argues, even if his throat problem was a completely separate disability from his head and stomach pains, Minnesota Life should have looked at his application for disability coverage to determine his occupation.

The sparse case law on the definition of "regular occupation" in Illinois does not address the issue before us. In *Bell*, 260 N.E.2d at 116,[12] and in *Rahman v. Paul Revere Life Insurance Co.*, 684 F.Supp. 192 (N.D.Ill.1988),[13] the issue was which of two occupations, a specialty or general field, was the insured performing at the time of his injury. The courts were not asked to choose explicitly between an occupation at the time of injury or the occupation in the application. Notably, however, both courts assumed that they were inquiring about the insured's regular occupation at the time of his injury.

■■■ The assumption made by these two cases is compatible with the view taken by other courts in the United States. Other courts interpreting the term "regular occupation" have held that term to be unambiguous and that disability benefits should be determined from the occupation of the insured at the time of injury or sickness, not the occupation stated in the insurance policy.[14]

**12.** In *Bell*, 260 N.E.2d at 116, the occupation of the insured as listed in his application governed; however, the issue before the court was quite different from the one that confronts us today. In *Bell*, in his application for the insurance policy, the insured listed his occupation as "planer operator." The insurance agent could not find "planer operator" in his rate book and, therefore, told the insured that his occupation would be "machinist" for rate purposes but that "planer operator" would describe his duties. The insured later became incapable of working as a planer operator and began working as a bench hand, an occupation that also fits under the generic description of "machinist." After the insurance company denied the insured benefits because he was not disabled from his regular occupation of a machinist, the court examined whether to engage in his regular occupation meant to perform (1) familiar duties, or (2) duties specifically listed in the application for insurance. The Illinois court found that the policy did not clearly answer the question and therefore the ambiguity should be resolved in favor of the insured. Thus, the court declared the insured disabled from the occupation listed in the application, planer operator, even though he could still work as a bench hand.

Our case presents, of course, a different issue. In *Bell*, the insured had one continuous injury disabling him, and thus calculating what occupation to use for the determination of his benefits was always the occupation he held at the time of the injury. The problem with the policy arose because the agent listed a general occupation while the insured told him a specific occupation. Thereafter, in resolving the ambiguity of what the insured's actual occupation was at the time of injury, the court used the specific occupation listed in the application as the one to calculate the insured's disability benefits. In Mr. Winter's case, no dispute exists about what occupation Mr. Winter was actually doing at the time of his sickness, as in *Bell*, but rather whether, in calculating his occupation, the court should look to his occupation at the time of injury or the occupation in his application.

**13.** *Rahman*, 684 F.Supp. at 195 applies Illinois case law concerning the definition of "regular occupation;" however, the court was asked to resolve a problem different from the one before us. In *Rahman*, the insured worked as a doctor specializing in emergency cardiology. However, after an injury, he did not possess the mobility for emergency cardiology, although he could still work in general cardiology. The district court stated that Illinois law requires ambiguous provisions to be resolved against the insurer, and because the term "regular" occupation was ambiguous here, the doctor's regular occupation at the time of his injury was his specialty of emergency cardiology, not the general field of cardiology.

**14.** *Metropolitan Life Ins. Co. v. Foster*, 67 F.2d 264, 265–66 (5th Cir.1933) (concluding that "occupation" in the policy refers to the insured's usual occupation at the time of the disability); *New York Life Ins. Co. v. Saunders*, 314 Ky. 577, 236 S.W.2d 692, 695 (1951) (stating that the case "should have been governed by the controlling occupation or occupations of the insured at the time his alleged disability began, and should not have been

## 4.

Because, as the above discussion demonstrates, the appropriate focus is on the occupation in which Mr. Winter was engaged at the time of his sickness, we must determine what the record reveals about Mr. Winter's occupation at the time of the disabling condition.

One possible perspective is to determine that, while Mr. Winter was a pit trader, he became disabled due to his head and stomach pains. If his first disability, due to head and stomach pains, did end on August 31, 1995, his throat problems can be characterized as a second disability.[15] This second disability occurred while Mr. Winter worked as a computer trader. Although throat problems might well disable an individual from work as a pit trader, that infirmity would not disable Mr. Winter as a computer trader and, therefore, he

would not be entitled to disability benefits from his throat problem. This perspective is the one adopted by the district court.

There are, however, three other characterizations that, if supported by the evidence of the record, would permit Mr. Winter to recover benefits as a pit trader. If an issue of fact exists with respect to any one of these approaches, summary judgment is inappropriate. First, if Mr. Winter does not have two distinct disabilities, but one continuous disability, his regular occupation is that in which he was engaged at the time of the initial disability, a pit trader. Thus, if the fact-finder determines that Mr. Winter was still disabled from head and stomach pains when his throat condition emerged, then Mr. Winter did not obtain a new regular occupation when he started computer trading. According to Mr. Winter's policy, if he began

confined to his occupation at the time the policy was issued"); *Hopkins v. North Am. Co. for Life and Health Ins.*, 594 S.W.2d 310, 315 (Mo.Ct.App.1980) (agreeing that "regular occupation" generally means insured's occupation at the time the disability occurs); *Colaluca v. Monarch Life Ins. Co.*, 101 R.I. 636, 226 A.2d 405, 410 (1967) (holding that when "regular occupation" is not defined in the policy it becomes the work insured was doing at the time of his injury); 1C Appleman's Insurance Law and Practice § 671 (1981) (stating that the occupation referred to in the insurance policies is the occupation insured was carrying on at the time he was injured).

*Emerson v. Fireman's Fund, American Life Insurance Co.*, 524 F.Supp. 1262, 1267 (N.D.Ga.1981), relied upon by Minnesota Life, is compatible with this trend. In *Emerson*, a court reporter suffered from arthritis which would have disabled him from stenographic typing; however, at the time the arthritis set in, the insured was performing his job with a Stenomask, into which he repeated the court proceedings by voice. In deciding on the insured's claim for disability benefits due to his arthritis, the court held that, when an insurance contract refers to an occupation to be used in calculating benefits, the salient occupation is the occupation that the insured performed when he became injured. When an insured changes jobs, it is his occupation at the time of the disability, not at the time the policy went into effect, that controls. Thus, the court determined, the insured was not entitled to disability benefits for his arthri-

tis because that condition did not disable him from reporting the court proceedings by stenovoice, his occupation at the time of the injury.

Similarly, in *Francois v. Mutual Life Insurance Co.*, 405 So.2d 1292, 1295 (La.Ct.App. 1981), relied upon by the district court, the court determined that the insured's occupation at the time of injury controlled. In *Francois*, the insured listed his occupation in his application as president of his interior decorating business; however, the trial court found that the major function of his job involved heavy manual labor. When the insured injured himself, he became disabled from his occupation if it involved heavy manual labor. The insurer argued that his injury did not disable him from being the president of the business, the occupation stated in his policy. The court held that because the policy contemplates and guarantees the right of the insured to change his occupation without an increase in premiums or a decrease in benefits, disability should be tested from the occupation in which the insured was engaged at the time of the injury, manual labor, not the occupation stated in the policy. Therefore, the court found that the insured was disabled from his regular occupation and entitled to benefits.

**15.** In this scenario, the throat problem cannot be a recurrent disability because it did not manifest within 6 months of the end of the original disability.

a different occupation while still disabled, then he continues to receive his full, original benefits from pit trading.[16]

 Second, if Mr. Winter had not "changed" his regular occupation from pit trader to computer trader, then his voice problems would have occurred while his regular occupation was still a pit trader. If a party is merely on a leave of absence from his regular occupation, and working in a side occupation, when he is injured, his regular occupation, not the side occupation, is the relevant occupation for the purpose of benefits. *See Hopkins*, 594 S.W.2d at 316; *Benefit Ass'n of Ry. Employees v. Secrest*, 239 Ky. 400, 39 S.W.2d 682, 685 (1931) (holding that the insured's regular occupation is that occupation which he usually, normally did, not which he did while on a leave of absence). Therefore, if the fact-finder could determine that Mr. Winter did not change his occupation from pit trader to computer trader, but he was merely on a leave of absence, Mr. Winter's disability benefits should be determined from the standpoint of pit trading.

Finally, if Mr. Winter has a recurrent disability then he can recover benefits as a pit trader. Minnesota Life acknowledged this position in its letter of December 1996. In its letter, Minnesota Life informed Mr. Winter that he did not have a recurrent disability as defined in the policy because he did not have medical verification of the voice condition within six months from the last disability payment of August 31, 1995. However, Minnesota Life stated that if Mr. Winter could establish that he received medical treatment for his voice condition within six months of August 31, 1995, he could recover benefits for a recurrent disability. If the fact-finder determines that Mr. Winter's reflux, as shown by his stomach condition, continued until at least October, and that his reflux, as manifested by his throat problem, was documented by a doctor in April, then he could recover for a recurrent disability of reflux because the two periods of disability would be within six months.

## B.

### 1.

 We shall now determine whether the record before us demonstrates that there is a genuine issue of triable fact with respect to any of the theories of recovery available to Mr. Winter. On the basis of the physicians' reports, as submitted to Minnesota Life, we believe that there is a genuine issue of triable fact as to the continuation of Mr. Winter's disability past August 31, 1995.[17]

---

**16.** The policy states:

> What if you engage in a different occupation while you are still disabled?
> If you work on a part-time or full-time basis in a different occupation while you are still disabled, you will continue to be eligible to receive the full monthly income benefit regardless of your earnings in that new occupation.

R.19, Ex.1 at 7.

**17.** Minnesota Life argues that Mr. Winter waived the issue of the continuation of his disability. If a party does not raise an issue before the district court, the party waives the right to assert that issue on appeal. *See Huntzinger*, 143 F.3d at 307; *Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1237–38 (7th Cir.1997). A party opposing the entry of summary judgment must inform the judge of the factual and legal reasons why the motion should not be granted but, if the party fails to do so, then the party waives the right to argue that issue on appeal. *Id.*

Mr. Winter did not fail to assert the issue of the continuation of his disability in the district court, but instead asserted the factual reasons why summary judgment should not be granted for Minnesota Life on the issue of whether or not Mr. Winter's disability continued past August 31, 1995. In "Plaintiff's Reply Memorandum in Support of Motion for Summary Judgment and Plaintiff's Response Memorandum in Opposition to Defendant's Motion for Summary Judgment," Mr. Winter denied the factual allegations of Minnesota Life that his disability had ended in August 1995, and thus preserved the issue for appeal. First, Mr. Winter's memorandum stated that Minnesota Life claimed that he had two separate disabilities, but Mr. Winter responded that he had one sickness, reflux, with multiple symptoms of stomach pain and throat problems. Next, Minnesota Life stated that Mr. Winter could

Mr. Winter's physicians submitted letters to Minnesota Life about his condition, beginning in March 1995 and continuing into October 1995. In March, Dr. Rosenbaum, his general physician, listed Mr. Winter's disability as head pain and abdominal pain. His report stated that the disability was possibly related to Mr. Winter's employment and that he did not expect a change in Mr. Winter's condition in the future because Mr. Winter's stress and job would not change. Then in October, Dr. Rosenbaum wrote that Mr. Winter's condition was stress reaction, esophagitis, and reflux, and that stress-related headaches and abdominal pain precluded Mr. Winter from being active in his occupation.[18]

In short, Dr. Rosenbaum, his treating physician, did not state that Mr. Winter's disability had ended; in fact, he wrote that it continued. Notably, he made specific reference to the reflux that, it was later determined, affected the vocal cords.

Similarly, Dr. Heller, in March 1995, initially reported that Mr. Winter's disability consisted of headaches, "mental fogginess," and fatigue and that the disability related to Mr. Winter's employment. When asked about Mr. Winter's condition in October 1995, Dr. Heller responded that Mr. Winter reported chronic headaches which interfered with his ability to perform his usual work-related activities and that Mr. Winter had difficulty handling the

return to work after August 31, but Mr. Winter replied that there was no showing that any treating physician released Mr. Winter to return to work. Minnesota Life also contended that Mr. Winter did not submit medical verification of his disability past August 31, but Mr. Winter responded that he continued to submit medical opinions and medical records to Minnesota Life after August 31.

Mr. Winter's memorandum summarized his position as follows:

There is an important difference between the time a sickness or injury occurs and the time the disability results.... It was Dr. Hanson's opinion that progressive damage to the vocal folds occurred over several years. In the case of Mr. Winter he suffered from hoarseness, headaches and stomach pain for a period of time before he had to stop work. The headaches and hoarseness were reported in March 1991 by Dr. Heller. The abdominal discomfort and tenderness in the epigastric area were reported in January 1994 by Dr. Sparberg. Abdominal pain can be a symptom of gastrointestinal reflux. If reflux effects [sic] a person's vocal cords it can cause hoarseness, throat irritability and scarring of the vocal folds. These early report [sic] show symptoms of what was later diagnosed as reflux.

Based upon the symptoms, Mr. Winter's sickness, which was reflux, started long before April, 1996. The reflux first caused pain, which is a symptom that Mr. Winter could feel. He knew he was suffering from a sickness and was seeking treatment from various physicians. The damage to the vocal cords was diagnosed in April, 1996, when he was finally referred to a specialist who could view the vocal cords. Under the

policy a sickness is a disease or illness which is being treated *or* diagnosed. It was admitted by Defendant that in 1995 Mr. Winter was diagnosis [sic] with reflux.

Applying case law cited by Defendant, the court must consider Mr. Winter's regular occupation from the date that the illness began which was several years before the first visit to Dr. Hanson. There is no dispute that Mr. Winter's regular occupation in March, 1995, before the examination by Dr. Hanson, was a stock options trader.

Even under the cases holding that regular occupation should be determined at the time disability starts, the disability started in March, 1995 and Mr. Winter was paid disability benefits for the period from March to August 31, 1995 by Defendant.... Applying case law cited by Defendant, the Court must consider Mr. Winter's regular occupation from the date that the disability commenced, which was March, 1995. There is no dispute that his regular occupation in March 1995 was as a stock options trader.

R.21 at 9–11 (citations omitted).

18. Contrary to Minnesota Life's oral argument, although Dr. Rosenbaum had referred Mr. Winter to a stomach specialist, that specialist had not seen Mr. Winter since 1994; on the other hand, Dr. Rosenbaum had seen him at the latest in February of 1995. Dr. Rosenbaum informed Minnesota Life that he was treating Mr. Winter for his stomach problems. Indeed, after Minnesota Life wrote to Dr. Rosenbaum and stated it was unaware of anyone treating Mr. Winter for his stomach pains, Dr. Rosenbaum answered that he was treating Mr. Winter for that condition.

stresses of his occupation. Furthermore, Mr. Winter reported headaches, stomach pains, and a racing heart, and Dr. Heller stated that these symptoms could persist indefinitely.

The reports of Dr. Rosenbaum and Dr. Heller, when read together, establish that sufficient evidence exists to present a genuine issue of triable fact about the continuation of Mr. Winter's disability past August 31, 1995. The letters of Mr. Winter's two treating physicians, written within two months of the termination of his disability benefits, state that his condition still existed and was related to his work and thus preclude the grant of summary judgment.

### 2.

We also believe that the record before us requires that there be further proceedings with respect to whether Mr. Winter has a recurrent disability. The evidence of record would permit a fact-finder to determine that, at least until October 1995, Mr. Winter was suffering from a gastric reflux condition that, over time, can affect the vocal cords. That manifestation of the underlying problem became apparent, the trier of fact might conclude, in April 1996 when the damage to the vocal cords was documented. Indeed, the district court acknowledged that the condition of Mr. Winter's larynx is related to his stomach disorder because the acid from his stomach scarred his vocal cords. *Winter*, 1998 WL 887091, at *2. While the evidence does not compel this result, it certainly permits the trier of fact to reach such a conclusion.

### Conclusion

Because we conclude that the trier of fact could find that Mr. Winter has a continuing or recurrent disability, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

REVERSED and REMANDED